**Edward MADDOX, Petitioner,**

v.

**Michelle ELIZE, Warden, Central Detention Facility, Respondent**

**No. Crim.A. 96–151 (SS).**

United States District Court, District of Columbia.

Dec. 23, 1999.

Ronald Dixon, Mary Barbara Murphy, William John O'Malley, Jr., U.S. Attorney's Office, Washington, DC, for Petitioner.

Thomas Abbenante, David A. Howard, Federal Public Defender for D.C., Washington, DC, for Respondent.

### *MEMORANDUM OPINION*

SPORKIN, District Judge.

In 1996, while on parole from a 1981 District of Columbia conviction, Edward Maddox was arrested and charged with being a felon in possession of a firearm when a gun was found in a car that he had rented.[1] Maddox was not in the car when he was arrested. His first trial, before this Judge, ended in a mistrial with a hung jury, 10–1 in favor of acquittal.[2] A second trial, before another Judge in 1997, pro-

duced a conviction, but that verdict was overturned due to the prosecutor's reference to matters not in the record in her closing statement. At Maddox's third trial, before this Judge, he was acquitted. After the acquittal, the District of Columbia Board of Parole (the "Parole Board") revoked Maddox's parole on the basis of the charges tried before this Court. Maddox has now spent more than three years in prison since his 1996 arrest, despite having been acquitted of any wrongdoing.

Maddox's parole revocation hearing was prosecuted by the same Assistant United States Attorney (with the approval of three of his superiors) who lost the case before this Court, a somewhat exceptional event since AUSAs are not authorized by law to prosecute such matters, and the AUSA in question had never appeared at a parole revocation hearing in his first 21 years of government service. Maddox has petitioned for a writ of habeas corpus pursuant to 28 U.S.C. § 2241, claiming that the prosecutor's "vindictive behavior" and *ex parte* contacts with the Parole Board improperly tainted his hearing, and deprived him of due process of law under the Fifth Amendment to the Constitution.

### *Background*

In 1996, Edward Maddox was living in Northeast Washington, on parole for a series of offenses which occurred in 1981. On April 9, 1996, Maddox and two friends were together in a parking lot in an area of Washington, D.C. known as Simple City, a high crime area. Maddox and his associates were stopped by some 10–12 "jump out" police officers, some in masks. The "stop" was based upon the police officers' investigation of the crime of "incommoding." "Incommoding" is a common law crime defined as a group of three or more individuals blocking a pedestrian walkway, and since 1892 has been a crime in the

---

1. A related drug charge was eventually dismissed.

2. One juror was dismissed when he failed to attend deliberations, and the parties agreed to go forward with eleven jurors.

District of Columbia. See D.C.Code § 22–1107. A District of Columbia police officer testified at Maddox's trial that groups of officers routinely "jump out" of their cars and accost people in crime-prone neighborhoods for "incommoding" as a pretext for a contraband search.

The police testified that as they approached Maddox he dropped a set of keys on a key chain showing the Enterprise car rental company logo.[3] The police officer located a car in the parking lot with a license plate displaying the Enterprise logo. Maddox was arrested after a handgun and a quantity of PCP were found under the driver's seat of the car, along with Maddox's driver's license and a car rental agreement in his name. Maddox's fingerprints were not found on any of the evidence, and he was not in the car at the time of the arrest. Indeed, no witness placed Maddox in the car on the day of his arrest. The drug charge was dismissed by the government prior to the third trial. Maddox was tried before this Court in September 1996. A mistrial was declared after the jury stated that it was hopelessly deadlocked, 10–1 in favor of acquittal. Citing the 10–1 vote for acquittal, this Court released Maddox into the community on September 17, 1996, pending retrial. During this period, Maddox was a law abiding citizen.

The second trial was held before Judge Harold Greene on February 27, 1997, and resulted in a conviction. Maddox was incarcerated on February 28, 1997, and has remained in prison ever since. The conviction was reversed on appeal because the prosecutor argued facts not in evidence in her closing statement to the jury. *United States v. Maddox,* 156 F.3d 1280 (D.C.Cir. 1998). The prosecutor made excuses for why the car keys were not kept as evidence, and bolstered a police officer's testimony by declaring that all of the other police officers, had they been called to testify, would have corroborated the government's version of the facts. In reversing the jury's verdict, the Court of Appeals remarked:

> "The practice disregards, indeed violates, the rules governing the admission of evidence. Typically, the attorney's statements amount to blatant hearsay about matters not in the record. The transgressing attorney makes himself an unsworn witness. And when it is the prosecutor who goes outside the record, the effect is to deprive the defendant of his right to cross-examine the witnesses against him."

*U.S. v. Maddox,* 156 F.3d at 1282.

Maddox's third trial was held before this Judge in April 1999. At that trial, for the first time, Maddox put on a defense. His girlfriend at the time, now his wife, Dorothy Maddox, testified that on the day in question she took the car to visit her sister. While at her sister's home, she loaned the car to her now-deceased nephew, Robert Gordon, at his request. Later in that day Mrs. Maddox testified that she received a call from Maddox to deliver the car to him at the parking lot in Simple City. Mrs. Maddox stated that she retrieved the car from her nephew and drove the car to Simple City where she exited the car and gave the keys to Maddox. She said her sister, Kokeeta Edwards, followed her in Ms. Edwards' car and she left the area in her sister's car. Kokeeta Edwards confirmed Mrs. Maddox's testimony.

Martin Colbert, a Metrobus driver, testified that on April 9, 1996, he received a call from Maddox who said he needed a ride from Landover, Maryland to the District. Colbert stated that he picked Maddox up at his place of residence and delivered him to the parking lot at Simple City. Antonio Harper, who at the time of the trial was incarcerated, testified that he

---

**3.** The testimony at trial puts this matter in dispute. At the third trial, one of Maddox's friends testified that a police officer forcefully removed the set of keys from Maddox's pants pocket. Maddox did not testify at his third trial, although he did put on a defense through other witnesses.

met Maddox in the parking lot and was with him when the "jump out" event occurred. He confirmed that Mrs. Maddox drove up in the Enterprise car and after parking it gave the key to Maddox. At no point on that day did he see Maddox in that car.

In its rebuttal case, the Government called Myisha Foxworth. She identified herself as Robert Gordon's live-in girlfriend. She testified that on the day in question Gordon obtained the Enterprise car from his aunt and the two of them drove off in the car. She stated that Gordon had several guns, and that on the day in question, she saw Gordon place a handgun in his waistband before they drove off in the car. When shown the gun that was retrieved from the Enterprise rental car she said it resembled the gun her boyfriend had on that day. She testified that her boyfriend dealt in drugs and was murdered prior to the third trial.

As stated above, no witness placed Maddox in the rental car on the day in question. The government's main police witness was impeached at trial by prior inconsistent statements about his investigation of Mr. Maddox. Three days after the arrest in 1996, the officer testified at a preliminary hearing that he had personally removed the gun from under the rented car's driver's seat, while wearing gloves. He stated then that he held the gun by the grips to avoid smudging possible fingerprint evidence. At the 1999 trial, the officer stated that while he did discover the gun, he had in fact not removed it from the car. Moreover, at trial he misidentified the weapon and had to be recalled to identify a second weapon as the one that had been found in Maddox's rental car.

The jury returned a verdict of not guilty in less than one hour. This Court ordered Maddox's immediate release on April 19, 1999. For reasons that are still unclear, that order was not complied with, and on April 21 the Parole Board executed a detainer, seeking to revoke Maddox's parole.

Maddox filed a habeas corpus petition pursuant to 28 U.S.C. § 2241. On April 22, this Court issued an order to the Parole Board, directing it to show cause why Maddox should not be released pending his revocation hearing. At a hearing on April 26, 1999 the Parole Board claimed that this Court lacked jurisdiction to order Maddox's release from the District of Columbia detention facilities. This Court found that it did have jurisdiction under 28 U.S.C. § 2241. *See, Sutherland v. District of Columbia Board of Parole*, 366 F.Supp. 270 (D.D.C.1973); *Blair–Bey v. Quick*, 151 F.3d 1036 (D.C.Cir.1998) (finding that district court had jurisdiction to entertain habeas petition challenging D.C. Parole Board procedures in denial of parole).

At the April 26, 1999 hearing, the Parole Board's only explanation for its decision to continue Maddox's incarceration was a concern for public safety should Maddox be released into the community. The Court found that concern was problematic, as Maddox was on release following his first trial, for nearly five months, including the period of the pendency of his second trial. During that time, Maddox complied with the conditions of his parole and the Parole Board took no action to have him recommitted. Maddox's continued incarceration, after being acquitted by a jury, cannot be easily squared with the Parole Board's prior indifference to Maddox's release.

At the conclusion of the April 26 hearing, this Court again released Maddox, and instructed him to appear at the District of Columbia Jail for a parole revocation hearing, scheduled for May 4, 1999. In an emergency motion, the District of Columbia obtained a stay of this Court's order releasing Maddox, from the Court of Appeals for the District of Columbia Circuit. As a result, Maddox remains in prison at this time.

*The Parole Revocation Hearing*

Maddox's parole revocation hearing was held on May 4, 1999 at the D.C. Jail.

Members of the District of Columbia Parole Board were present at the hearing, as were Maddox and his lawyer, David Howard, who summoned some of the same witnesses who had testified at Maddox's 1999 trial before this Court. Also present was the AUSA from Maddox' trial. The AUSA brought one of the officers who had testified at Maddox's trial, but did not bring the officer whose testimony was impeached.

Before the hearing began, at the Parole Board's request, the AUSA had an *ex parte* meeting with it, behind closed doors. Mr. Howard testified that the meeting lasted approximately 15 minutes; the AUSA stated that it lasted possibly up to 12 minutes. At the hearing before this Court, the AUSA could not recall what was discussed at that meeting. He did not deny that he possibly went over the merits of his case against Maddox.

It is evident from the transcript that the AUSA prosecuted the case against Maddox at the hearing.[4] He called and cross-examined witnesses. He introduced evidence and objected to admission of certain evidence.[5] The AUSA even had the hubris to instruct the Parole Board how to proceed in this matter:

> [**AUSA**]: You're not only looking at the trial, you're looking at Mr. Maddox as an individual that you're responsible for in returning to the community. If you so choose, now understand, I was a parole officer at one point. In Morrissey v. Parole says, that you first, as you're doing, have to make a determination whether or not there's reason to believe he's violated his parole. All

right. And that is not reasonable doubt. It's, he could be violated, and I understand, I may be wrong, if he's within 10 feet of PCP, that's a violation in and of itself. But anyway Morrissey says you have to make two determinations. Says—whether it's reasonably violated and if he had violated, then you have to decide whether or not you'll revoke and reinstate or revoke and allow—the sentence. Or revoke and you whatever you think is necessary or appropriate given the circumstances.

> I think Mr. Maddox has gotten more than his fair share in consideration from this Board. I think that [the witnesses] that Mr. [Howard] called at the trial, all want to come and help him. All wanted to do what they could to make sure that they were trying to help him. I wouldn't go so far as to call them liars. All right. I wouldn't do that. That's not my job to call people names. They went in, they testified, and maybe I don't know. I didn't talk to them. He didn't talk to them either. All right. We're assuming what they did fits our perspective on the case. We don't know because we didn't talk to them.

> \* \* \* \* \* \*

> Now, what I would urge the Board to do is based on the technical violations by themselves. I think there's an ample ground for the Board to find that Mr. Maddox is in violation of his parole. What I would urge the Board to do is of the mind to find that there is a violation. To consider as it does with other inmates and prisoners that come before

---

4. The AUSA's role at the parole revocation hearing was discussed at the recent hearings before this Court. Counsel for the Parole Board initially took the position that The AUSA appeared only as a witness. Counsel for the United States admitted that The AUSA appeared as an "advocate." The AUSA testified that he appeared to provide "balance" at the revocation hearing, and that he identified himself as an AUSA. He stated that he did not "represent" the United States, or its interests, at the hearing. Counsel for the United States

conceded that the AUSA did in fact represent the U.S. Attorney's Office at the parole revocation hearing.

5. See Transcript at 31, 41, 51, 56, 65, 71, 85, 94, 101, 138 (AUSA cross-examining witnesses, and inserting his own version of the evidence); 126–27 (AUSA convinces the Board not to consider evidence impeaching a prosecution witness).

you the amount of effort that Mr. Maddox has put into the privilege of being parole, just the way you look at everyone else. And determine whether or not you are satisfied that Mr. Maddox did what you expect in any other person that comes through that door to do. Live up to the privilege of being on parole.

And if you find that Mr. Maddox has not lived up to that privilege, I would urge you to let his sentence come into effect, because he has had more than a chance to impress you. More than a chance to go out there in the community and be a good citizen. Instead of being up there in sinful city he should have been home with his wife or working on a job instead of hanging out with his friends on [simple] city. Everyone knows what goes on up there. He— grew up there. Why would he on parole put himself in a position of being in a place like simple city. He knows police gone come up there. That was his choice. And now he sits before you and says it was somebody else's fault. And that's the reason why all of this happened. So, I came here to assist you as much as I can, to give you the evidence, to counter the defense perspective in this case, to give you another perspective. And, I don't envy you having to make this decision. It's a very difficult one.—It's very very difficult. But, on the same hand, all of you agreed to do this. All of you agreed to have intestinal fortitude and the fairness to do it. And just like Mr. Howard said, if he did it, you gotta call him that he did it. If he didn't do it and you feel that he's done well on parole, then turn him loose. Revoke him and then reinstate him, like the—. And that's all I have to say, unless you have questions.

Parole Hearing Transcript at 208–12. The AUSA's actions at the revocation hearing speak for themselves. The AUSA argued for Maddox's continued incarceration based in large part on the evidence that the jury in this case had already considered and found did not prove Maddox's guilt. Implicit in the jury's verdict are findings on the credibility of witnesses. The AUSA urged the Board to ignore those credibility determinations and find that the defense witnesses were all in effect perjurers, and that the policemen told the truth, but were victimized by defense counsel's "tricks."

The Parole Board, stating that it was relying at least in part on the AUSA's presentation and arguments, revoked Maddox's parole. At the time of the revocation, Maddox had already been incarcerated for nearly three years for a crime with respect to which he had been acquitted. As a result of his parole being revoked, Maddox is not eligible for reparole until October 21, 2000. By that time he will have served over four years for a crime a United States Court and jury found he has not committed.

### Hearing on Maddox's Petition

This Court presided over a hearing on Maddox's petition on November 30 and December 8, 1999. At the hearing, Maddox's counsel called as witnesses several criminal defense attorneys who regularly handle parole revocation hearings. Those attorneys uniformly testified that they had not known an Assistant United States Attorney to prosecute a parole revocation hearing, especially after the defendant had been acquitted of the underlying charges that formed the basis of the hearing.

The United States, the District of Columbia, and the Parole Board, did not produce any statistical evidence of how often an AUSA appears before the Parole Board. The respondents proffered that such statistics are not maintained. The United States did suggest that there was some anecdotal evidence of prosecutors appearing before the Parole Board, but only on a handful of occasions. Counsel could not state how often (if ever) federal prosecutors who lose criminal trials continue to prosecute the same defendant before the

Parole Board. Counsel for the United States identified one case of an AUSA appearing at a parole revocation hearing following an acquittal in the underlying offense. The respondents maintained that nothing prohibited an AUSA from appearing before the District of Columbia Parole Board.

David Howard, Maddox's counsel at the trial that ended in acquittal, testified that the AUSA prosecuted the trial with an overly combative attitude, as if the AUSA had a personal stake in the outcome of the trial. Howard stated that things became "testy" between him and the AUSA during trial, and that the AUSA was angry at the trial. Howard testified that he was surprised to see the AUSA at the parole hearing. He said that the AUSA told him that it was the prosecutor's prerogative to appear at a revocation hearing and that prosecutors regularly appear at parole revocation hearings.

Howard testified that prior to the hearing, the AUSA met alone with the Parole Board for approximately fifteen minutes. Howard also had a private meeting with the Parole Board which lasted about five minutes. Howard stated that in his meeting, the Board described its procedures and rules, and inquired of counsel's theory of the case. Howard provided a road map of the evidence and arguments he would present. From that meeting, Howard inferred that the Board had asked similar questions of the AUSA, and had elicited the AUSA's theory of the case and opinions in the AUSA's private meeting. The AUSA did not deny he discussed substantive issues with the Parole Board during his private session with the Board. The AUSA testified that he saw a tape recorder in the room when he met with the Board. The Court requested the tape of the private meeting if it was recorded. Counsel for the Parole Board has not produced a tape of the meeting and it is thus

assumed that the meeting was not recorded.

The AUSA testified that he did not "*prosecute*" Maddox's parole revocation, but appeared to provide "balance" and answer questions from the Board. The AUSA admitted that in nearly 22 years as a prosecutor, including eight years in a supervisory role, he had never before appeared at a parole revocation hearing. He testified that he received prior authorization from three of his superiors to appear at the parole revocation hearing. The AUSA stated that although he had never heard of an AUSA appearing at a parole revocation hearing after the defendant had been acquitted of the underlying offense, he did recall one occasion when he advised a colleague to attend a parole revocation hearing that did not involve an acquittal.

The AUSA stated that he did not know about the parole revocation hearing, and did not plan to attend, until he learned of Maddox's habeas corpus petition in a hearing before this Court after the acquittal. The AUSA stated that he went to the revocation hearing because he had free time, and he believed Maddox was a danger to the community. He reiterated that he wanted to provide the Board with a "balanced" view of the charges against Maddox. The AUSA believed that he had a strong case against Maddox, and that he lost because Mr. Howard effectively impeached the government's witnesses. As noted above, when asked about his role at the hearing, the AUSA stated that he did not represent the United States, but that he was merely there to assist the Board. The United States later conceded at argument that the AUSA did appear at the hearing in his official capacity representing the United States.

*Analysis—Prosecutorial Vindictiveness*

Maddox urges this Court to reinstate his parole because the revocation hearing was improperly tainted by prosecutorial vindictiveness.[6] Due Process pro-

---

6. Respondents argue that Maddox's habeas

petition is barred because he failed to exhaust

hibits the government from exercising its authority in such a manner as to retaliate against a defendant for the valid exercise of a constitutional or statutory right such as defending his rights at a criminal trial or habeas proceeding. *See Blackledge v. Perry,* 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974); *North Carolina v. Pearce,* 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969); *United States v. Jamison,* 505 F.2d 407 (D.C.Cir.1974). If the circumstances demonstrate "a realistic likelihood of 'vindictiveness,'" the Court may presume vindictiveness, which is unconstitutional even without evidence of a retaliatory motive on the government's part. *United States v. Meyer,* 810 F.2d 1242 (D.C.Cir.1987); *Blackledge,* 417 U.S. at 28, 94 S.Ct. 2098.

In *Pearce,* the Supreme Court had before it a retrial following a successful appeal, and found that the imposition of a longer sentence in the retrial equated to "a penalty upon the defendant for having successfully pursued a statutory right of appeal or collateral remedy [which] would be no less a violation of due process of law" than a penalty for exercising a constitutional right. 395 U.S. at 724, 89 S.Ct. 2072. The Court built on that holding in *Blackledge,* where it found that a State may not indict a defendant on greater charges in a second trial when a defendant is convicted by a trial court and then exercises a statutory right to a trial de novo. The Court found that the government had a "considerable stake in discouraging convicted misdemeanants from appealing and thus obtaining a trial de novo" and that indictment on greater charges under those circumstances violated due process. *Blackledge,* 417 U.S. at 27–29, 94 S.Ct. 2098. The Court also noted, as it did in *Pearce,* that the absence of any evidence

that the prosecutor acted in bad faith or had an actual retaliatory motivation was not significant because due process requires that a defendant "be free of apprehension of such a retaliatory motivation." *Blackledge,* 417 U.S. at 28, 94 S.Ct. 2098.

Here, Maddox argues that he is entitled to the presumption of vindictive behavior by the United States and the AUSA. After losing at trial, the AUSA prosecuted the parole revocation hearing. The question before the Court is whether the AUSA's actions rose to the level of "vindictiveness."

■ This Court finds ample evidence that Maddox's parole revocation hearing was improperly tainted by the vindictive actions of the AUSA and his superiors who approved his actions. First, the AUSA's claim that the government had a strong case against Maddox is clearly in error [7]. The jury in the third trial acquitted Maddox in less than one hour. As the government's case against Maddox was purely circumstantial (the presence of a gun in a car that Maddox had rented at a time when Maddox was not in the car), the jury members necessarily relied on their evaluation of the credibility of the witnesses. The government's case lacked credibility. The police officer's misstatements about handling the gun, and his misidentification of the gun at trial are two instances where credible testimony was lacking. Because the government's case was based solely on circumstantial evidence and there was no testimony placing Maddox in the Enterprise rental car on the day of his arrest, the government's case was not strong. Moreover the evidence presented by the defense that showed Maddox was not in the car on the day in question was not contradicted. To accept the AUSA's ver-

his state remedies. As this Court has previously found, petitions filed under 28 U.S.C. § 2241 may be initially filed in federal court rather than a local court. The D.C. Circuit in *Blair–Bey v. Quick,* 151 F.3d 1036, 1043 (D.C.Cir.1998) found that the exhaustion requirements of D.C.Code § 16–1901 are not

applicable to petitions filed under § 2241, which allege constitutional violations and do not challenge a conviction or sentence.

7. Indeed, the AUSA told the Parole Board that its decision in this case was a "very very difficult" one. Transcript at 212.

sion of the facts would have required a trier of fact to disbelieve all witnesses but the testifying police officers.

The AUSA's second justification for prosecuting the parole revocation hearing, that it was an important case because of Maddox's danger to society, is not substantiated by the record. If Maddox were a danger to society, then the Parole Board should have taken action during the five months subsequent to Maddox's release after his first trial, prior to his conviction in the second trial. The AUSA's claim that Maddox's case was important and worthy of his personal prosecution before the Parole Board is belied by the fact that he has never seen fit, over a 21 year career as a prosecutor, to prosecute any other parole revocation hearing, much less appear at such a hearing.

■ It is clear to this Court that actual vindictiveness has been established by a preponderance of the evidence. The testimony establishes that the AUSA was upset about losing this case, which he blames on defense counsel's successful impeachment of government witnesses, and putting on a defense case. After hearing about the scheduled Parole Board hearing, the AUSA took over the Parole Board's function and prosecuted Maddox a second time. The only difference in the second prosecution was a lower standard of proof and relaxed evidentiary standards, which allowed the AUSA to get the "conviction" and sentence he was denied at trial. The AUSA was not invited to appear as a witness by the Board; rather he took it upon himself to insinuate himself into the proceeding to see that Maddox would not

be freed after his acquittal. This is clear evidence of prosecutorial vindictiveness.[8]

■ As for the second basis for granting Maddox relief, the Court finds that the Parole Board's *ex parte* discussion of the case with the AUSA violates Maddox's constitutional rights. While the AUSA testified that he does not recall what was discussed during the 12–15 minutes he spent alone with the Board prior to the hearing, the Court finds from the details of Mr. Howard's meeting that the AUSA presented an outline of his case and gave his reasons for revoking Maddox's parole. This violates Maddox's constitutional right to confront and cross-examine witnesses at a hearing where he is duly present. That right includes the right to be present at every stage of the proceedings. *See Morrissey v. Brewer,* 408 U.S. 471, 484, 489, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); *Faretta v. California,* 422 U.S. 806, 820 n. 15, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).

Putting aside the vindictive nature of the AUSA's prosecution of Maddox's parole revocation, this Court is further troubled by the United States taking any position at the hearing, after Maddox had been acquitted in this Court. That acquittal is binding on the United States, and the United States would normally be estopped from relitigating the issue of Maddox's guilt. The constitutional right against "double jeopardy" guarantees that Maddox could not be charged with the same crime and tried a second time after being acquitted. While double jeopardy does not preclude a subsequent civil proceeding or a state court action even involving the same set of operative facts, what the government did in this case requires that it be

8. The Court notes that the respondents have submitted no authority for the AUSA's prosecution of the hearing, and rests on a discredited theory that the AUSA was only an advocate or witness, but not a prosecutor before the Parole Board. Indeed, prosecution of the District of Columbia (or any state's) Parole Board hearing is not among the enumerated powers of the United States Attorney. 28 U.S.C. § 547(1). Although the United States

Attorney in the District of Columbia does have authority to prosecute criminal offenses in the District, D.C.Code § 23–101, parole is not a part of a criminal prosecution. *Morrissey v. Brewer,* 408 U.S. at 481, 92 S.Ct. 2593. The D.C.Code sections and regulations do not grant any authority to United States Attorneys to prosecute D.C. Parole Board matters. *See* D.C.Code § 24–201.2; 28 DCMR 219.4.

estopped from retaliating against an individual because he exercised his constitutional right to a jury trial.

The AUSA did not act alone in this case. His actions were approved by three superiors in the United States Attorney's office.[9] Thus, the AUSA's actions were taken by the Department of Justice. While the Department of Justice has the responsibility to protect the citizens of this nation against those who pose a threat to the safety of the community, it must do so within the reach of the Constitution. What it did in this case far exceeds the limits of propriety, the Department's ethical standards, and the United States Constitution.

Here the Department of Justice prosecuted the Defendant on three occasions in three different trials. After the second trial, when the conviction was overturned because the prosecution went outside the record in her summation to the jury, the Defendant was tried for a third time. At this trial the Defendant was acquitted. The Department of Justice, unhappy with the results, proceeded against the Defendant in a different forum, before the District of Columbia Parole Board. While the prosecution made light of the very serious credibility problems of its police witnesses, it urged the Parole Board find that all of the defense witnesses were perjurers, although none of these witnesses has been charged with the crime of perjury. Implicit in the AUSA's charge is that defense counsel may well have suborned perjury by putting on the testimony of these witnesses. Indeed, in his testimony before this Court, the AUSA stated that defense counsel made a mistake by presenting such a defense.

By the Government proceeding the way it did in this case shows a lack of a basic sense of decency and fairness. It has put an individual on trial three times. This individual has now been incarcerated for over three years with respect to a crime in which a jury found him not guilty.

Not satisfied with depriving an individual of over 1,000 days of liberty for a crime a jury found he did not commit, the Department of Justice retaliates by prosecuting the Defendant for committing the same crime before the Defendant's Parole Board. By reciting these facts, it is clear Maddox has been denied his rights under the Fifth Amendment to the Constitution.

The Court does not mean to usurp the power of the D.C. Parole Board to decide matters legitimately prosecuted by the Board and its staff. Indeed, the Court is well aware of the differences between a criminal prosecution and a parole revocation hearing. There are different standards of proof and evidence, and the sanctions imposed serve different purposes. The Court is not attempting by its decision to indicate that an acquittal in a criminal case negates the possibility of a parole revocation. What this Court is saying is that the government cannot use the forum of a parole revocation hearing to retry a defendant as part of a vindictive action to jail someone the government believes to be a bad person particularly because that person has exercised his right to a jury trial.

The Court has no quarrel with representatives of the United States Attorney appearing as witnesses at parole revocation hearings. Indeed, their intimate knowledge of the evidence may, in appropriate circumstances, be of great value to the Parole Board. It is only where the government exceeds these limits where it runs into trouble. Once it takes on the role of prosecuting parole violation cases after a jury has acquitted the defendant, it opens itself up to the charge of vindictiveness.

### Relief

But for one new issue raised at the parole revocation hearing, the Court would

---

9. The Court advised counsel for the United States Government that it would assume that such prior authorization had been granted unless she advised the Court to the contrary. No such advice has been presented to the Court.

order that Maddox's parole be reinstated. This is because of the excessive nature of the Government's actions. The new issue involves the credibility of Maddox's testimony before the Parole Board. The Board questioned Maddox about the source of money he had on his person at the time of the arrest (around $210), and the source of funds he used to pay for various rental cars (around $4,000 in the aggregate). The Board did not accept Maddox's testimony on these issues. Maddox did not explain where the money came from. He stated that he had a job at a grocery store that paid $300 per week, but the evidence showed that Maddox did not hold that job at the time of the arrest.

The Parole Board did not revoke Maddox's parole on the basis of these issues, but did consider them in evaluating Maddox's credibility. Because the Board attached a great deal of significance to Maddox's credibility, the Court concludes that the appropriate course to follow would be to remand this matter to the Parole Board for a new revocation hearing, with the following conditions:

1. The new parole revocation hearing shall be held and concluded within 30 days from the date of this Opinion;

2. The entire record of the May 4, 1999 parole revocation hearing should be expunged, and Maddox should be treated as if the May 4, 1999 hearing never took place. The new hearing shall be recorded in its entirety and there shall be no *ex parte* contacts;

3. The AUSA who prosecuted the trial in this Court and who appeared before the Parole Board at the May 4, 1999 hearing should not be allowed to prosecute or attend the new hearing even as a witness, and the hearing shall not be conducted by any member of the United States Attorney's office without the express ap-

proval of the United States Attorney after a determination that the prosecution of the hearing could not be effectively handled by the hearing examiner or someone affiliated with the District of Columbia Office of Corporation Counsel; .

4. The hearing should take place before an independent parole examiner or hearing officer who played no role in the May 4, 1999 hearing. The person selected should be sequestered or screened, to the extent possible, from the record of the May 4, 1999 hearing.[10] The examiner's findings should be transmitted to the Parole Board, with those members who participated at the May 4, 1999 hearing, absenting themselves from the proceedings (except to be present for a quorum). If there are no Parole Board members who are not tainted by their participation in the earlier proceeding, then the matter should be returned to this Court for review;

5. Should the defendant cause witnesses to testify on his behalf, any findings on the credibility of those witnesses and the impact of their testimony shall be explicitly stated in the evaluation of the evidence for or against Mr. Maddox;

6. If it is found that Mr. Maddox indeed violated the terms of his parole, the Parole Board should make findings of fact and set forth the length of the revocation period with Mr. Maddox being given full credit for all of the time he has been incarcerated on the underlying charges since his arrest in September 1996. Noting that Maddox has already spent over three years in jail for a crime he was acquitted of, any additional period of incarceration must

**10.** Counsel for the Parole Board stated that aside from the Parole Board that meets at the D.C. Jail, there are at least two other hearing examiners who can conduct parole revocation hearings and recommend findings to the Board.

be balanced against the time Maddox has already served.[11]

An appropriate order shall issue.

### ORDER

This matter is before the Court on Defendant's petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2241. A hearing was held, and the parties' positions were fully briefed. For the reasons given in the accompanying Memorandum Opinion, defendant's petition for a writ of habeas corpus is hereby **GRANTED IN PART**; and it is further

**ORDERED** that the defendant, Edward Maddox, be provided a new parole revocation hearing before an independent hearing examiner of the District of Columbia Board of Parole; and it is further

**ORDERED** that the defendant's new parole revocation hearing shall be provided on the following conditions, which are to be strictly construed:

1. The new parole revocation hearing shall be held and concluded within 30 days from the date of this Order;

2. The entire record of the May 4, 1999 parole revocation hearing should be expunged, and Maddox should be treated as if the May 4, 1999 hearing never took place. The new hearing shall be recorded in its entirety and there shall be no *ex parte* contacts;

3. The AUSA who prosecuted the trial in this Court and who appeared before the Parole Board at the May 4, 1999 hearing should not be allowed to prosecute or attend the new hearing even as a witness, and the hearing shall not be conducted by any member of the United States Attorney's office without the express approval of the United States Attorney after a determination that the prosecution of the hearing could not be effectively handled by the hearing examiner or someone affiliated with the District of Columbia Office of Corporation Counsel;

4. The hearing should take place before an independent parole examiner or hearing officer who played no role in the May 4, 1999 hearing. The person selected should be sequestered or screened, to the extent possible, from the record of the May 4, 1999 hearing. The examiner's findings should be transmitted to the Parole Board, with those members who participated at the May 4, 1999 hearing absenting themselves from the proceedings (except to be present for a quorum). If there are no Parole Board members who are not tainted by their participation in the earlier proceeding, then the matter should be returned to this Court for review;

5. Should the defendant cause witnesses to testify on his behalf, any findings on the credibility of those witnesses and the impact of their testimony shall be explicitly stated in the evaluation of the evidence for or against Mr. Maddox; and

6. If it is found that Mr. Maddox indeed violated the terms of his parole, the Parole Board should make findings of fact and set forth the length of the revocation period with Mr. Maddox being given full credit for all of the time he has been incarcerated on the underlying charges since his arrest in September 1996. Noting that Maddox has already spent over three years in jail for a crime he was acquitted of, any additional period of incarceration must be balanced against the time Maddox has already served.

It is bad enough that Maddox has been improperly detained; his resulting deafness will last a lifetime.

---

11. The Court also notes that while Maddox has been imprisoned for a crime he was acquitted of, he received a severe beating that has resulted in a loss of hearing in one ear.

The Court retains jurisdiction over this matter to provide such other and further relief as may be necessary.

SO ORDERED.