UNITED STATES of America,

v.

Susan ROSENBERG, Defendant.

No. SSS 82 CR. 312(CSH).

United States District Court,
S.D. New York.

May 10, 2000.

Mary Jo White, U.S. Atty., Andrew C. McCarthy, of counsel, New York City, for U.S.

Williams & Connolly, Washinton, DC, Howard W. Gutman, Thomas G. Fentoff, of counsel, Gordon, Altman, Weitzen, Shalov & Wein LLP, New York City, Laurence J. Zweifach, Richard Cashman, of counsel, for Defendant.

## MEMORANDUM OPINION AND ORDER

HAIGHT, Senior District Judge.

On August 30, 1985, the government sought and obtained leave to file a nolle prosequi dismissing the captioned indictment in its entirety against defendant Susan Rosenberg. Nearly fifteen years later and in large part, if not solely, on account of her alleged involvement in the crimes included in the dismissed indictment, Rosenberg was denied release on parole from a 58–year sentence she is currently serving after being convicted in the District of New Jersey on unrelated charges. Perceiving this as a miscarriage of justice, Rosenberg now moves this Court to reconsider its grant of nolle prosequi and to grant appropriate relief.

## I. BACKGROUND

### A. The Brinks Indictment In This District

In 1982, Rosenberg was indicted in this District, along with numerous others, in *United States v. Shakur,* 82 Cr. 312, also known as the "Brinks case." The indictment alleged a conspiracy to commit several "fund-raisers" or armed robberies to raise money for the revolutionary activities of the conspiracy members (also known as "the Family"). Among the crimes committed by the Family were armed robberies, kidnapings, the jail break of Joanne Chesimard, and the murders of two police officers and two Brinks armored truck guards.[1] Rosenberg's alleged role was as a member of the Family's secondary team whose job was to arrange for getaway cars, safe houses, and reconnaissance.

The first Brinks trial in this Court was held in 1983, before Judge Duffy and a jury. Six of the eleven defendants named in the indictment were tried: two of the defendants were convicted on RICO counts, two were found guilty as accessories after the fact, and two were acquitted on all charges. Although maintaining her innocence of any and all of the Brinks crimes, Rosenberg became a fugitive and was not apprehended until November 29, 1984.

### B. The New Jersey Indictment, Conviction and Sentence

During the time Rosenberg was at large, she allied herself with one Timothy Blunk in a conspiracy to further their revolutionary ends and political ideas. In preparation for an undefined terrorist campaign, Rosenberg and Blunk stockpiled a large

---

1. "The 'Family's' final and most notorious crime, the 'Brinks robbery' of October 20, 1981, resulted in the shooting deaths of a Brinks guard and two police officers in Nanuet and Nyack, New York." *United States v. Shakur,* 888 F.2d 234, 236 (2nd Cir.1989).

For convenience I will refer throughout this opinion to the crimes alleged in that original indictment and the subsequent superceding indictment as "the Brinks case," "the Brinks crimes," "the Brinks charges," "the Brinks allegations" or "the Brinks conspiracy."

amount of firearms, explosives and false identification documents and badges. Both Rosenberg and Blunk were arrested before they could carry out their destructive plan. The self-proclaimed "professional revolutionaries" were tried for these crimes in the District of New Jersey and found guilty on all counts. They did not deny their guilt, instead viewing the trial and subsequent sentencing as a forum to air their political views. They insisted on being absent from most of the proceedings, instructed their advocates to remain inactive, considered themselves political prisoners, disavowed the legitimacy of the Federal court and the United States government, and otherwise refused to cooperate in any way. On May 20, 1985, District Judge Frederick B. Lacey sentenced both defendants to 58 years in prison.[2]

Before imposing sentence, Judge Lacey explicitly stated that:

> in sentencing I'm giving no consideration to Rosenberg's involvement, if any, in the acts and crimes charged in the Southern District of New York, wherein it's alleged that she participated in various armed robberies and murders, and among other things, the jail breakout of Chesimard. Rosenberg is still to be tried on those charges and I'm being as specific as I can be so that the prosecution and the court having jurisdiction over the matter there will know that my sentence here is not based in the slightest on any involvement that Rosenberg may have had in what is there charged.

(Tab 4, p. 46).[3]

The government and Rosenberg dispute the meaning of that statement. Rosenberg argues that this is clear evidence that the length of her sentence for her New Jersey crimes was never meant to include or be influenced by her alleged involve-ment in the Brinks case. On the other hand, the government contends that Judge Lacey merely intended to preclude Rosenberg from making any double jeopardy challenge if and when she was tried in this Court for the Brinks crimes.

The government's interpretation seems more likely, given the fact that Judge Lacey addressed his statement to the "prosecution and the court having jurisdiction over" the Brinks case, rather than to the Parole Commission. The government might even be conservative in its interpretation, since Judge Lacey was possibly seeking to foreclose not only a double jeopardy challenge, but also, lest anyone think that the Brinks crimes had already been considered, the possibility that the New Jersey sentence be used to mitigate any sentence Rosenberg might ultimately receive for the Brinks crimes.

Even if, as Rosenberg contends, Judge Lacey meant this pronouncement as a recommendation to the Parole Commission not to consider Rosenberg's alleged involvement in the Brinks crimes when determining parole eligibility, an unlikely proposition since the judge addressed the Parole Commission directly later in the sentencing and in a separate parole recommendation, (Tab 4, p. 53; Tab 5), the Parole Commission would not be bound by such recommendation. *See* 28 C.F.R. § 2.19(d) (1999).

Interestingly, regarding the place of incarceration, and referring to Family member Marilyn Buck's escape from prison, Judge Lacey warned, "it will be remembered that Rosenberg's 'comrade', Marilyn Buck, was permitted to walk out of Alderson on a legal furlough to visit her attorney, Tipograph. Tipograph and Rosenberg are more than just attorney and client. They have been associates, com-

---

**2.** Although Rosenberg appealed the length of her sentence on multiple grounds, the Third Circuit upheld the term of imprisonment. *See United States v. Rosenberg,* 806 F.2d 1169 (3nd Cir.1986). Rosenberg does not now argue that the 58–year sentence was improper.

**3.** "Tab" references are to the exhibits submitted with Rosenberg's present motion.

panions and roommates. I am sure the Bureau of Prisons will make certain that Rosenberg does not profit from the same mistake that was made as to Buck." (Tab 5, pp. 2–3). Marilyn Buck was later convicted in this Court for her involvement in the Brinks crimes. This belies any suggestion that Judge Lacey completely disassociated Rosenberg from the Brinks case or its participants. In any event, this Court considers the statement at sentencing only for its plain meaning, that is, that the 58 year sentence was based entirely on Rosenberg's New Jersey crimes.

Aware that Rosenberg and Blunk would be eligible for parole consideration after only 10 years of imprisonment,[4] Judge Lacey was adamant about and explicit in his view that it would be "a terrible mistake if these defendants were to be released from prison after serving only 10 years if their attitude then is as it is now." (Tab 5, p. 2; Tab 4, p. 53). Accounting for the possibility that the Parole Commission would decide at some future date that release was proper, Judge Lacey also emphasized the grave responsibility the Parole Commission would bear for any adverse consequences that might follow. *Id.*

## C. The Nolle Prosequi of the Brinks Indictment Against Rosenberg

In spite of her behavior at and attitude toward the New Jersey trial, Rosenberg contends that she maintained her innocence of the Brinks charges and wished to prove her innocence at the second Brinks trial for which the government was preparing. Rosenberg insisted on being arraigned in this District on those charges.[5] On August 26, 1985, while awaiting trial, Rosenberg's attorney, Susan Tipograph, made a motion on behalf of Marilyn Buck, Susan Rosenberg and Alan Berkman to consolidate their cases.[6] (Tab 7). Buck was charged in a separate indictment and was also represented by Tipograph. Berkman, who was charged in the same indictment as Rosenberg, consented to the consolidation motion.[7]

On August 30, 1985, the government moved for leave to file a nolle prosequi against Rosenberg. In its nolle application the government cited as the basis for the nolle "the lengthy sentence imposed by Judge Lacey and his recommendation regarding parole," namely, "that 'parole *not* be granted at the statutory maximum eligibility point of ten years.'" (Tab 8, p. 3). The Court granted the nolle without prejudice. Rosenberg maintains that the dismissal was granted over her objection, and that she was thereby denied the right to go to trial and contest the charges against her. There is no contemporaneous evidence to support this contention. Apparently, Rosenberg did object to the fact that the dismissal was granted without prejudice and moved that the nolle be entered with prejudice. By order dated September 17, 1985, Judge Duffy denied the motion as

---

4. The New Jersey case antedated the United States Sentencing Guidelines.

5. While consistent with them, I am not persuaded that Rosenberg's insistence on being arraigned, standing alone, substantiates her claims that she wanted to be tried on the Brinks charges and objected to the subsequent dismissal of the indictment.

6. Similarly, I am not persuaded that a motion to consolidate which predated the nolle prosequi supports Rosenberg's claim that she objected to a dismissal of the charges against her.

7. The government opposed the consolidation of Buck's case with that of Rosenberg and Berkman. Subsequently, the charges against Rosenberg were dismissed, rendering the consolidation motion moot as to her. As to Berkman, his availability for trial was uncertain at best as he was scheduled to appear as a defendant in two other trials in two other jurisdictions prior to trial on the Brinks charges. In addition, Berkman was charged only as an accessory after the fact to the Brinks crimes, whereas Buck was a principal. As a result, the government argued, consolidation was neither appropriate nor expeditious. (Tab 6). In an opinion issued in October 1985, I denied the consolidation motion. *United States v. Berkman,* 1985 WL 3390 (S.D.N.Y.1985).

moot, reasoning that until Rosenberg was reindicted, there would be no case or controversy.[8] It is that nolle prosequi that is the subject of the instant motion.

Rosenberg is currently serving her 58 year sentence for her New Jersey crimes, and is incarcerated in the District of Connecticut, at the Federal Correctional Institution in Danbury.

D. *Rosenberg's Initial Consideration For Parole: The Parole Commission's Inquiry and the Government's Response*

Pursuant to 18 U.S.C. § 4205(a), Rosenberg first became eligible for parole in 1994, after serving ten years of her term of imprisonment.[9] In preparation for Rosenberg's first parole hearing, the United States Parole Commission sent a letter dated August 31, 1994 to the United States Attorney for this District. The substantive paragraphs of that letter read as follows:

The above-named Subject is scheduled for a hearing within the next few weeks. Commission Examiners have determined that further information is needed to conduct the hearing in conformity with the Commission procedures. The information needed is described in the following manner:

Please provide details of subject's involvement in the bank robbery behavior(s) which resulted in people being killed. Were the charges prosecuted, if not, please advise the Commission as to why they were not. Did Ms.

Rosenberg participate in the crimes, if so please define her role.

It is the Commission's understanding that Ms. Rosenberg and others were charged under docket # SSS82CR312 in the Southern District of New York in an eight count indictment which included armed robbery and murder. Please provide details of her role in the behavior. Also, whether there was evidence which would support the charges.

The Commission would appreciate it if you would take the necessary action(s) to secure the needed information. One copy of your response should be sent to the institution of confinement, the original to this office. Your response should state that it may be disclosed to the Subject, or contain a summarization of non-disclosable information pursuant to 18 U.S.C., Section 4208(c).

The government responded in a single-spaced typed letter of just over seven pages, dated November 8, 1994 and signed by Assistant United States Attorney Kerri Martin Bartlett. AUSA Bartlett was one of the two prosecutors presenting the government's case at the trial of Buck and Shakur. The first six pages of her letter answer the questions posed by the Parole Commission: informing that the Brinks case against Rosenberg had been nolled, explaining why, and reviewing in detail the

---

8. There is some confusion as to which judge was responsible for Rosenberg's case at the time the nolle was entered. Judge Duffy presided over the first Brinks trial. Although Rosenberg did not appear for this trial, she was named in the indictment. On July 30, 1985, Rosenberg's case was reassigned to me. It is unclear to whom the motion requesting leave to file the nolle prosequi was directed. Although dated August 30, 1985, subsequent to the reassignment, both Judge Duffy and my initials appear on the motion. According to Judge Duffy's September 17, 1985 order denying as moot Rosenberg's motion to have the nolle entered with prejudice, it was Judge Duffy who granted leave to file the nolle in

the first instance, even though her case had been reassigned to me. It is certain that Judge Duffy decided Rosenberg's motion to have the nolle entered with prejudice. Nevertheless, since there is no dispute that the case was reassigned to me, the present motion is properly before me as opposed to Judge Duffy.

9. 18 U.S.C. §§ 4201–4218, which covered parole and the functions of the United States Parole Commission, were repealed by the Sentencing Reform Act, effective November 1, 1987, but remain applicable to persons convicted before that date.

government's perception of the evidence of Rosenberg's complicity in those crimes.

At the bottom of page 7, AUSA Bartlett's letter embarks upon a lengthy answer to a question the Parole Commission did not ask: whether Rosenberg should be paroled. That portion of the letter begins: "Rosenberg's present request for parole, coming as it does only ten years after her incarceration, is frivolous in the Government's view." The long sentences passed upon those Family members who were convicted or pled guilty in federal or state court are reviewed, with the additional comment: "It is ludicrous that Rosenberg would expect more lenient treatment than her secondary team co-racketeers, especially given the severity of her additional New Jersey crimes." The sufferings of the Family's victims are movingly recounted. (See, e.g., page 7 of the letter: "Sergeant O'Grady's widow and his young son Edward Jr., who was still trying to understand the reasons for his father's murder, occupied front row seats at the federal sentencing of Marilyn Buck in 1989.").

AUSA Bartlett's letter concludes with these words:

> Thus, even if Susan Rosenberg now professes a change of heart about her pursuit of violence as a means to achieve her political objectives, the wreckage she has left in her wake is too enormous to overlook. Rosenberg deserves to serve a lengthy sentence as punishment for her crimes and as a continued assurance to her victims and their families that our criminal justice system has not forgotten them. Her service of a lengthy prison sentence will also deter others who might arrogantly believe that the furtherance of their political beliefs is justification for violence. Rosenberg's parole request should be denied.

Given that there were no victims of her New Jersey offenses, Bartlett could only have been referring to the Brinks crimes. Rosenberg relies heavily on this letter as the basis for her argument that the government abused the nolle prosequi by, in effect, prosecuting Rosenberg in front of the Parole Commission, where she did not have the benefit of the greater due process protections that attach to a criminal defendant as opposed to a prisoner who is up for parole. Rosenberg was not paroled in 1994.[10]

E. *The Release on Parole of Rosenberg's New Jersey Co-defendant*

In March 1997, Rosenberg's coconspirator in the New Jersey crimes, Timothy Blunk, was released on parole. Blunk had been convicted of the same offenses and received the same sentence as Rosenberg. When the Parole Commission considered Rosenberg's application for parole in January 1998, she was denied release, even though the Parole Commission rated Blunk as having a greater potential risk of parole violation than Rosenberg. Most likely accounting for the different results is the fact that it was never alleged that Blunk had been involved in the Brinks crimes.[11] This is confirmed by the record

10. It is not clear whether Rosenberg was considered for parole in 1994, or whether for reasons unexplained on the present record, her initial hearing did not take place until 1998, the hearing that is the subject of the present motion. If there was a previous hearing, she does not contest that denial of parole, or the use, if any, of the government's letter in making that determination, on the present motion. Consequently, this factual uncertainty does not affect this decision.

11. Rosenberg suggests that since her co-defendant, Blunk, was released, and since, according to the Commission, Rosenberg is less likely to violate her parole, she too should be released. The intuitive appeal of this argument notwithstanding, the Parole Commission is not required to consider the parole status of her co-defendant. See Lynch v. United States Parole Commission, 768 F.2d 491, 497 (2nd Cir. 1985) ("The district court held that due process required the Commission to consider the parole status of Lynch's co-defendants at the time of his initial parole determination, and that no subsequent consideration could remedy the failure to do so. We disagree."). Even if the Parole Commission

of the parole hearing and the Commission's decisions.

## F. Federal Parole: The Statutory and Regulatory Scheme

18 U.S.C. § 4206 defines parole determination criteria. It provides, in pertinent part:

(a) If an eligible prisoner has substantially observed the rules of the institution or institutions to which he has been confined, and if the Commission, upon consideration of the nature and circumstances of the offense and the history and characteristics of the prisoner, determines:

(1) that release would not depreciate the seriousness of his offense or promote disrespect for the law; and

(2) that release would not jeopardize the public welfare;

subject to the provisions of subsections (b) and (c) of this section, and pursuant to guidelines promulgated by the Commission pursuant to section 4203(a)(1), such prisoner shall be released.

. . .

(c) The Commission may grant or deny release on parole notwithstanding the guidelines referred to in subsection (a) of this section if it determines there is good cause for so doing: *Provided,* That the prisoner is furnished written notice stating with particularity the reasons for its determination, including a summary of the information relied upon.

The guidelines referred to are set out in 28 C.F.R. § 2.20 (1999), and provide the Parole Commission with two methods of evaluating or rating an inmate's eligibility for parole. First, offense severity is rated on a scale of 1 to 8, Category Eight being the most severe. Second, a salient factor score, which indicates the potential risk of parole violation and measures offender characteristics, is calculated on a scale of 0 to 10, 10 indicating the lowest risk. The guidelines specify the customary range of time to be served before release for various combinations of the two scores.

A federal prisoner sentenced prior to the effective date of the Sentencing Reform Act and serving a term of more than thirty years is first eligible for parole after serving ten years of such sentence. 18 U.S.C. § 4205(a). "Whenever feasible, the initial parole determination proceeding . . . shall be held not later than thirty days before the date of such eligibility for parole." 18 U.S.C. § 4208(a); *but see,* 28 C.F.R. § 2.12 (providing that initial hearing be conducted nine months prior to parole eligibility date, "or as soon thereafter as practicable"). To activate the parole determination procedure, a federal prisoner must apply for parole. 28 C.F.R. § 2.11.

Thereafter an initial hearing is conducted at which the Commission shall set a presumptive release date, set an effective date of parole, or, as in the case of Susan Rosenberg, continue the prisoner to a fifteen-year reconsideration hearing.[12] 28 C.F.R. § 2.12. At the initial hearing, "[t]he examiner shall discuss with the prisoner his offense severity rating and salient factor score . . . his institutional conduct and, in addition, any other matter the examiner may deem relevant. . . . A prisoner may

were bound to take a co-defendant's parole status into account, the Parole Commission is not a party to this motion, and this Court does not have subject matter jurisdiction over claims regarding parole determination procedures in this case. *See* discussion *infra* Part II.B.

12. When the prisoner is continued to a fifteen-year reconsideration hearing, the Commission shall conduct a full reassessment of the case fifteen years after the initial hearing.

28 C.F.R. § 2.14(c). Interim hearings· are conducted every two years "to consider any significant developments or changes in the prisoner's status." 28 C.F.R. § 2.14(a)(1). After an interim hearing, the Commission may order no change or advance the date of the fifteen-year reconsideration hearing for superior program achievement or other exceptional circumstances. 28 C.F.R. § 2.14(a)(2).

be represented at a hearing by a person of his or her choice." 28 C.F.R. § 2.13. At the conclusion of the hearing, the hearing examiner or examiners make a recommendation regarding parole subject to the Regional Commissioner's approval. 28 C.F.R. § 2.23(d); § 2.24.

"[A] Regional Commissioner may designate certain cases for decision by a majority of the Commission, as original jurisdiction cases. In such instances, he shall forward the case with his vote ... to the National Commissioners for decision." 28 C.F.R. § 2.17(a). This action is taken in high profile cases, in the case of prisoners who have committed crimes against the security of the Nation, in cases involving large scale conspiracy, continuing criminal enterprise or complex and sophisticated planning, and in cases where the prisoner has been sentenced to a maximum term of 45 years or more. 28 C.F.R. § 2.17(b). A prisoner may then appeal an original jurisdiction decision to the National Appeals Board by making a petition for reconsideration within thirty days of the original jurisdiction decision. 28 C.F.R. § 2.27(a). The decision of the National Appeals Board is final. *Id.*

### G. *Rosenberg's Parole Hearings and the Denial of Parole*

Rosenberg's initial parole hearing was held on January 15, 1998. Rosenberg was represented by an attorney. At the hearing Rosenberg accepted responsibility for her New Jersey crimes, and stated that she recognized that violence was not a

proper means of advancing her political ends. Although she maintained that it was never her intention to harm anyone, she acknowledged that given the arsenal she and Blunk had assembled, her intentions notwithstanding, tremendous harm could have resulted. (Tab 14, p. 4). Rosenberg testified to and submitted numerous letters evidencing her impressive institutional adjustment. As to the Brinks charges, Rosenberg vehemently denied that she had been involved in any way. She also claimed that she had wanted to contest the charges and vindicate her name, but that over her objection, she was denied the opportunity to go to trial. (Tab 14, pp. 10–11). Even though Rosenberg and her attorney were given the chance to respond to the Brinks charges, specifically the information contained in AUSA Bartlett's letter, the hearing examiner noted that "you can't really properly defend it in this forum. I do understand that. You've said all you could to defend. But as far as putting on witnesses and being able to ... show your innocence, you really can't do it in this forum." (Tab 14, p. 21).

In spite of his words of empathy, the hearing examiner did not credit Rosenberg's denials, and was persuaded by a preponderance of evidence, *see* 28 C.F.R. § 2.19(c), that Rosenberg had been involved in the Brinks crimes, and was, thus, accountable for the robberies and murders that had occurred. He graded Rosenberg's offense severity as Category Eight, and gave her a salient factor score of 10.[13]

---

**13.** The examiner noted that he could have assigned a Category Eight based on the New Jersey crimes alone, (Tab 14, p. 13), but he clearly did factor the Brinks crimes into his calculation. (Tab 14, p. 12, 24–25). Rosenberg takes issue with the Category Eight rating for two reasons. First, Blunk received a Category Six rating. However, that is irrelevant to the present motion. *See* note 11 *supra.* Moreover, Blunk was never accused of participating in the Brinks conspiracy. Second, Rosenberg argues that only the offense of conviction should be considered when calculating the severity of the offense. Even if she is right, that theory attacks the propriety

of the Parole Commission's determination and the method in which it reached that determination. However, I reiterate that procedural violations committed by the Parole Commission are not properly before me. *See* discussion *infra* Part II.B.

Given her scores, assuming they were calculated correctly, according to the guidelines the customary time served prior to release is 100+ months. Having served over 157 months in prison as of the hearing, Rosenberg argues that, even with a Category Eight rating, she is eligible for release. However, I note that Rosenberg neglects the fact that "[t]hese time ranges are merely guidelines."

The examiner recommended a fifteen-year reconsideration hearing. Although this means that Rosenberg is not scheduled to receive a full reassessment of her case until the year 2013, an interim hearing will be held every two years, *see* 28 C.F.R. § 2.14(a)(1)(ii), during which the Commission has the authority to advance the date of the reconsideration hearing, albeit by a limited amount of time and only under special circumstances. § 2.14(a)(2)(ii). The examiner also recommended that the Regional Commissioner refer the case to the National Commissioners for original jurisdiction consideration. (Tab 14, p. 26). Apparently, the Regional Commissioner adopted the examiner's recommendations.

In February, 1998, the original jurisdiction decision affirmed the hearing examiner's recommendation and continued Rosenberg's case for a fifteen-year reconsideration hearing. This decision was appealed pursuant to 28 C.F.R. § 2.27. (Tab 13).

On April 14, 1999, the National Appeals Board (also referred to as the "Full Commission") affirmed the previous decisions, thereby making final the Commission's denial of parole. The National Appeals Board did not deem credible Rosenberg's claims of innocence of and noninvolvement in the Brinks conspiracy, instead concluding that the preponderance of the evidence supported findings to the contrary. While noting that it was not required to consider Blunk's parole status, the Full Commission explained that there were substantial differences between the co-defendants that justified the disparity, and, moreover, that releasing Blunk may have been a mistake. (Tab 16, p. 2; Tab 21, p. 6). The Full Commission apparently gave consideration to Rosenberg's offense of conviction, and, in fact, before rendering a final decision, remanded her case solely to explore further what Rosenberg intended to do with the explosives and firearms she and Blunk possessed at the time of their arrest. (Tab 9).

The hearing examiner conducted a reconsideration hearing on October 15, 1998. He concluded that the clarifications sought on remand regarding the offense of conviction did not warrant a change in the Commission's decision, (Tab 9, p. 5), and the Full Commission devoted its entire Notice of Action to a discussion of Rosenberg's involvement in the Brinks crimes. (Tab 16). Although the Full Commission acknowledged Rosenberg's change in attitude and institutional adjustment, it concluded that this progress was outweighed by the seriousness of her total offense behavior. As reasoned in one of the two original jurisdiction appeal summaries considered by the National Appeals Board, "There does not appear to be any risk to the public were she released on parole. The Commission's decision, therefore, rests solely on the other considerations of § 4206: whether release would depreciate the seriousness of the offense or promote disrespect for the law." (Tab 12, p. 5).

Having exhausted her administrative remedies, Rosenberg now appeals to this Court for appropriate relief. Her new attorney and the government have filed extensive briefs. The Court has heard oral argument.

The record clearly demonstrates that the Parole Commission found by a preponderance of the evidence that Rosenberg was a part of the Brinks conspiracy.

28 C.F.R. § 2.20(c). She also overlooks the footnote to the regulation explaining that "[f]or Category Eight, no upper limits are specified due to the extreme variability of the cases within this category. For decisions exceeding the lower limit of the applicable guideline category by more than 48 months, the Commission will specify the pertinent case factors upon which it relied in reaching its decision, which may include the absence of any factors mitigating the offense....However, ... the murder of a law enforcement officer to carry out an offense ... shall not justify a grant of parole at any point in the prisoner's sentence unless there are compelling circumstances in mitigation." § 2.20 (note 1). Again, I do not decide the merits of this argument because the issue is not properly before this Court. *See* discussion *infra* Part II.B.

Largely, if not entirely, on this basis, Rosenberg was denied release on parole. The Commission did not suggest that Rosenberg would pose a danger if released or that she was likely to violate her parole. Rosenberg argues that she has effectively been sentenced to an additional 15 years in prison for crimes for which she was never tried.

## II. *SUBJECT MATTER JURISDICTION*

Before reaching the merits of the present motion, the government contends that this Court lacks jurisdiction over this matter. However, the government is only partially correct.

Rosenberg's claims may be broadly divided into two categories. First, Rosenberg argues that the government abused the nolle, thereby harassing and causing prejudice to her. As such, she claims she is entitled to relief at the hands of this Court, to which the government presented the nolle. Second, Rosenberg attacks the method by which the Parole Commission arrived at its decision to deny her parole. While I have jurisdiction over Rosenberg's first claim, this Court lacks jurisdiction over the Commission's alleged procedural violations.

### A. *The Abuse of the Nolle*

As to the abuse of the nolle, the government contends that the indictment having been dismissed, the case was effectively terminated. Since the government has not attempted to reindict Rosenberg, and, in fact, concedes that, although the nolle was entered without prejudice, the government is now time-barred from prosecuting Rosenberg for the Brinks crimes, it concludes that this Court has no basis of jurisdiction. However, Rosenberg relies on the theory that the government, in effect, prosecuted her in front of the Parole Commission. If her characterization of the parole hearing as a prosecution at the hands of the United States Attorney's Office for the Southern District of New York

is correct, it would be analogous to a renewed prosecution by a second indictment.

As discussed *infra* Part III, courts may preclude the government from renewing a prosecution, see, e.g., *United States v. Derr*, 726 F.2d 617 (10th Cir. 1984); *United States v. Fields*, 475 F.Supp. 903 (D.D.C.1979), or reverse a conviction obtained in a trial on a second indictment, *see, e.g. United States v. Salinas*, 693 F.2d 348 (5th Cir.1982), in order to protect a defendant from harassment resulting from a dismissal of the original indictment. Accordingly, the nolle entered in this Court in 1985 is implicated by the alleged renewal of the Brinks prosecution against Rosenberg. Just as a court is empowered to dismiss a second indictment or reverse a conviction where it determines that the prosecutor has abused the nolle, so I may award appropriate relief, such as remanding Rosenberg's case to the Parole Commission for a new parole hearing, if I determine that the government has misused the nolle. This authority stems from the court's supervisory powers, and from Fed.R.Crim.P. 48, which governs the dismissal of charges, and provides that the government may dismiss an indictment only with leave of the court. The court, in effect, becomes a check on the power of the government to dismiss an indictment, in order to ensure that it is not exploited.

The fact that the prejudice to the defendant and abuse on the part of the government may not be evident until after the nolle is entered should not preclude a defendant from obtaining relief. This conclusion follows from the Supreme Court's holding in *Parr v. United States*, 351 U.S. 513, 517, 76 S.Ct. 912, 100 L.Ed. 1377 (1956), which limits the right to appeal a dismissal to those injured thereby, and held that Parr's appeal of the dismissal of an indictment against him would not lie. The Court explained that "[t]he testing of the effect of the dismissal order must abide petitioner's trial, and only then, if convicted, will he have been aggrieved."

Accordingly, in cases addressing violations of Rule 48, courts have precluded and condemned the government's attempts to renew a prosecution following a dismissal without prejudice. *See, e.g., Derr,* 726 F.2d 617; *Salinas,* 693 F.2d 348; *Fields,* 475 F.Supp. 903. Similarly, in the case at bar, Judge Duffy denied Rosenberg's motion to enter the nolle with prejudice as premature. Paraphrasing *Parr,* the testing of the nolle, the dismissal order, must abide Rosenberg's prosecution at the parole hearing, and only then, if denied parole, will she have been aggrieved.

Considering herself now aggrieved, Rosenberg seeks relief. Simply because the government allegedly resurrected the terminated Brinks prosecution in a new forum by its letter to the Parole Commission, rather than by reindicting Rosenberg in the original forum, does not mean the government's potential abuse of the nolle should escape review. *See Government of Virgin Islands ex rel. Robinson v. Schneider,* 893 F.Supp. 490 (D.Virgin Islands 1995) (government's dismissal of indictment without prejudice in the district court, followed by a filing of same charges in the territorial court, violated Rule 48, and district court on habeas petition made its prior dismissal order with prejudice). For the foregoing reasons, I may proceed to the merits of Rosenberg's argument to the extent that it is based on an asserted abuse of Rule 48.

### B. *Parole Determination Procedures*

In addition to her allegations that the government has, in effect, prosecuted her

for the Brinks crimes, Rosenberg contends that the Parole Commission erred in a number of ways when assessing her eligibility for parole.[14] The government cites the Second Circuit's decision in *Billiteri v. United States Board of Parole,* 541 F.2d 938 (2nd Cir.1976) for, *inter alia,* the proposition that "to the extent the movant has any constitutional claim about the Parole Commission's procedures or the manner in which it has administered her 58–year District of New Jersey sentence, her *only* remedy is a habeas corpus petition." (Government's Post–Argument Memorandum of Law, p. 5).

It is true that in *Billiteri,* the Court of Appeals held that the Parole Board is not the "custodian" of a prisoner, and, therefore, in order to establish jurisdiction an action challenging parole procedures must be brought against the warden of the prison in which the petitioner is confined. But habeas is not the only way to attack parole procedures. The Second Circuit explicitly held as much in *Williams v. Ward,* 556 F.2d 1143, 1150–1151 (2nd Cir.1977), when it clarified the meaning of the holding in *Billiteri:*

> [W]e think that, standing alone, [a prisoner's] request for a new parole hearing ... was a remedy available outside habeas corpus, since it ... concerned the manner of parole decision making, not its outcome. We recently suggested as much in *Billiteri v. United States Board of Parole,* 541 F.2d 938, 946 (2 Cir.1976):
>
> > The district court has no power to substitute its own discretion for that of the Board. If the court has found

**14.** Rosenberg contends that the Parole Commission failed to give due weight to her codefendant's parole status, *see* discussion *supra* note 11; miscalculated her guidelines score with respect to the severity of the offense, *see* discussion *supra* note 13; erroneously deemed her ineligible for release no matter what her offense severity rating, *see* discussion *supra* note 13; abused its discretion in finding that there was a preponderance of evidence to support the Brinks allegations; and, mistakenly considered her alleged involvement in Brinks when deciding that re-

lease would "depreciate the seriousness of [her] offense," as that phrase is used in 18 U.S.C. § 4206(a)(1). Rosenberg maintains that this subsection only contemplates the offense of conviction. According to Rosenberg, unrelated conduct should only be considered in assessing dangerousness of the potential parolee pursuant to § 4206(a)(2). Therefore, she concludes, the Commission having determined that Rosenberg was not dangerous, the Brinks allegations were rendered irrelevant. *See* discussion *infra* Part III.D.

that the Board has abused its discretion, it may remand the case to the Board with instructions for correction. If the case was before the court on a petition for habeas corpus, it may order compliance within a reasonable period, failing which it may order the petitioner discharged from custody.

In *Williams,* the defendant had filed a 42 U.S.C. § 1983 claim attacking parole determination procedures adopted by the defendant New York State Board of Parole. Williams requested a new parole hearing, or, in the alternative, immediate release. Rosenberg also makes these alternative requests for relief. While release is a remedy that can be obtained only through petition for habeas, *see Williams,* 556 F.2d at 1150–1151; *see also, Billiteri,* 541 F.2d at 947, the Court of Appeals affirmed the district court's decision, in *Williams,* to "ignore" the request for release so that it might reach the merits of the claim regarding parole hearing procedures. *Williams,* 556 F.2d at 1151.

Recognizing that Rosenberg's present motion is not a petition for habeas corpus, I too "ignore" her request for immediate release. However, unlike *Williams,* I also must ignore her arguments to the extent they raise claims against the Parole Commission itself, as opposed to the government's alleged interference with the parole determination. Williams brought his § 1983 action against, *inter alia,* the Parole Board, which was accordingly a party defendant. The § 1983 claim afforded the court a basis upon which to assess the propriety of the Parole Board's actions. In the present case, Rosenberg is in this Court only as a result of the nolle entered in connection with the Brinks case. The present proceeding is not a habeas petition, nor is the Parole Commission a party. Consequently, her claims in this Court are limited to her allegations concerning the abuse of the nolle, and do not provide this Court with jurisdiction to review the Pa-

role Commission's actions. To the extent that I discuss parole procedures and the actions of the Parole Commission in the instant case, I do so only to provide sufficient context in which to evaluate the actions of the government and to decide whether it did, in fact, abuse the nolle as alleged.

## III. *DISCUSSION*

### A. *Rule 48(a) and the "Leave of Court" Provision*

■ Rule 48 of the Federal Rules of Criminal Procedure governs the dismissal of charges. It provides, in pertinent part:

(a) **By Attorney for Government.** The Attorney General or the United States attorney may by leave of court file a dismissal of an indictment, information or complaint and the prosecution shall thereupon terminate. Such a dismissal may not be filed during the trial without the consent of the defendant.

Although the decision to dismiss charges was historically left entirely within the discretion of the prosecutor, Rule 48(a) now requires that the court grant permission. "The Rule sets forth no criteria to guide the Court in the exercise of its discretion, nor does it require that the prosecutor state his reasons." *United States v. Greater Blouse, Skirt & Neckwear Contractors Association,* 228 F.Supp. 483, 486 (S.D.N.Y.1964). Therefore, I must rely on judicial interpretation in ascertaining the scope of discretion afforded by Rule 48(a).[15]

In addressing this very issue, the Fifth Circuit has stated:

[I]t seems altogether proper to say that the phrase "by leave of court" in Rule 48(a) was intended to modify and condition the absolute power of the Executive, consistently with the Framer's concept of Separation of Powers, by erecting a check on the abuse of Execu-

---

15. I begin with an examination of holdings of the Fifth Circuit since that court has written more extensively on the subject than any other court.

tive prerogatives. But this is not to say that the Rule was intended to confer on the Judiciary the power and authority to usurp or interfere with the good faith exercise of the Executive power to take care that the laws are faithfully executed. The rule was not promulgated to shift absolute power from the Executive to the Judicial Branch. Rather, it was intended as a power to check power. The Executive remains the absolute judge of whether a prosecution should be initiated and the first and presumptively the best judge of whether a pending prosecution should be terminated. The exercise of its discretion with respect to the termination of pending prosecutions should not be judicially disturbed unless clearly contrary to manifest public interest.

*United States v. Cowan,* 524 F.2d 504, 513 (5th Cir.1975). While this analysis provides a useful context within which to consider Rule 48(a), the Court of Appeals' reading begets another question of interpretation, namely, what is meant by "contrary to manifest public interest"? In *Cowan,* the Fifth Circuit said only that the Rule contemplated something more than just protection of the defendant.[16] *Id.* at 512.

In *Rinaldi v. United States,* 434 U.S. 22, 29–30, 98 S.Ct. 81, 54 L.Ed.2d 207 (1977), the Supreme Court adopted the Fifth Circuit's "contrary to manifest public interest" standard when reviewing a district court's denial of a motion to dismiss pursuant to Rule 48(a). Although its analysis was short, the Supreme Court furnished some criteria to consider when evaluating a Rule 48(a) motion, and provided a brief explanation of the purpose behind the Rule. In a footnote, the Court observed:

The words "leave of court" were inserted in Rule 48(a) without explanation. While they obviously vest some discretion in the court, the circumstances in which that discretion may properly be exercised have not been delineated by this Court. The principal object of the "leave of court" requirement is apparently to protect a defendant against prosecutorial harassment, e.g., charging, dismissing, and recharging, when the Government moves to dismiss an indictment over the defendant's objection....But the Rule has also been held to permit the court to deny a Government dismissal motion to which the defendant has consented if the motion is prompted by considerations clearly contrary to the public interest.

*Rinaldi,* 434 U.S. at 30, note 15, 98 S.Ct. 81 (internal citations omitted). With that background in mind, the Court focused its inquiry, stating that "[t]he salient issue ... is ... whether the Government's later efforts to terminate the prosecution were ... tainted with impropriety. Our examination of the record has not disclosed (and we will not presume) bad faith on the part of the Government at the time it sought leave to dismiss the indictment against petitioner." *Id.* at 30, 98 S.Ct. 81. Although the Supreme Court did not hold that a finding of bad faith is a necessary prerequisite to a denial of a motion to dismiss, it certainly opined that the government's intention in or motivation for seeking dismissal of an indictment is relevant to a determination of whether dismissal is contrary to manifest public interest, and suggested that a finding of bad faith could satisfy the *Cowan* standard. The decision in *Rinaldi* is also significant because it creates a presumption of good faith on the part of the prosecutor absent evidence to the contrary.[17] Rosenberg al-

---

**16.** In *Cowan,* although the Court reversed the district court's denial of the motion to dismiss, it concluded that, under appropriate circumstances, a court may deny a motion to dismiss even where the defendant consents to the dismissal. In other words, the Court allowed for the possibility that the public inter-

est may be violated even where the protection of the defendant is not at stake. *See also, United States v. Hamm,* 659 F.2d 624, 629 (5th Cir.1981).

**17.** In *Rinaldi,* as in *Cowan,* the defendant had consented to the motion to dismiss, and, therefore, the Court focused on whether the

leges bad faith on the part of the government based on both its initial decision to dismiss the indictment and its subsequent letter written to the Parole Commission in 1994. However, Rosenberg contends that even absent a finding of bad faith, this Court may hold that the nolle has been abused and, in order to protect the defendant, grant relief.

Following the Supreme Court's lead, the Fifth Circuit has clarified the "contrary to public interest" standard first introduced in Cowan and equated it with bad faith on the part of the government. In United States v. Hamm, the Court stated that "the trial judge must look to the motivation of the prosecutor at the time of the decision to dismiss." United States v. Hamm, 659 F.2d 624, 629 (5th Cir.1981). Presuming good faith, the Fifth Circuit continued: "[n]either this court on appeal nor the trial court may properly reassess the prosecutor's evaluation of the public interest. As long as it is not apparent that the prosecutor was motivated by considerations clearly contrary to the public interest, his motion must be granted." Id. at 631. In United States v. Smith, 55 F.3d 157, 159 (5th Cir.1995). the Fifth Circuit expounded its earlier holdings, stating that "[t]he disposition of a government's motion to dismiss an indictment should be decided by determining whether the prosecutor acted in good faith at the time he moved for dismissal. A motion that is not motivated by bad faith is not clearly contrary to manifest public interest, and it must be granted."

In Cowan, Rinaldi, Hamm and Smith, the defendants consented to the dismissal motions. Therefore, although these cases are instructive in deciphering Rule 48(a)'s leave of court language, they are distinguishable on the facts.[18] However, United States v. Salinas, 693 F.2d 348 (5th Cir.

1982), serves as an illustration of the Fifth Circuit approach in a case where the defendant was unfairly prejudiced by the dismissal. In Salinas, the district court dismissed the indictment. The government then reindicted the defendant and secured a conviction. Because the record showed that the sole reason for the dismissal was the prosecutor's discontent with the jury selected, the Court of Appeals held that the dismissal should not have been granted. Absent any other available remedy, the conviction on the second indictment was reversed. Although the Fifth Circuit acknowledged that "the primary purpose of the rule is protection of a defendant's rights," it held that "[t]he key factor in a determination of prosecutorial harassment is the propriety or impropriety of the Government's efforts to terminate the prosecution-the good faith or lack of good faith of the Government in moving to dismiss." Salinas, 693 F.2d at 351. The Fifth Circuit suggested that it is not always inappropriate for the government to dismiss an indictment and later recharge the defendant, but rather that it sometimes amounts to harassment where the prosecutor's reasons or motivation are improper.

The Second Circuit Court of Appeals has not had occasion to analyze the scope and discretion afforded by Rule 48(a). However, this Court, in an opinion by Judge Weinfeld, addressed the leave of court provision, and its interpretation is consistent with the more extensive analysis conducted by the Fifth Circuit. The case is United States v. Greater Blouse, Skirt & Neckwear Contractors Association, where the government moved to dismiss the indictment for lack of evidence. Although the Court noted that the Rule does not expressly require the prosecutor to state his reasons for dismissal,[19] the Court stat-

dismissal was contrary to the public interest, and did not need to consider the possibility of prosecutorial harassment.

18. Here, Rosenberg argues that she objected to the dismissal and that she has been unfairly prejudiced by the dismissal.

19. The Court observed that a draft of the Rule included a requirement that the prosecutor

ed that "the Rule contemplates public exposure of the reasons for the abandonment of an indictment, information or complaint in order to prevent abuse of the uncontrolled power of dismissal previously enjoyed by prosecutors. Accordingly, to gain the Court's favorable discretion, it should be satisfied that the reasons advanced for the proposed dismissal are substantial and the real grounds upon which the application is based." *Greater Blouse,* 228 F.Supp. 483 at 486. Continuing its discussion of the standard envisioned by the Rule, the Court held that the prosecutor is entitled to a presumption of good faith and that dismissal should be denied only where "clearly and convincingly ... the public interest requires its refusal." *Id.* Although renewal of the prosecution was not contemplated, the Court also stressed that "dismissal is not for the purpose of subjecting a defendant to harassment by the commencement of another prosecution at a different time or at a place deemed more favorable to the prosecution." [20] *Id.* at 487.

█ Rosenberg contends that there are two distinct lines of cases addressing Rule 48(a). According to Rosenberg, in the first, the defendant objects to the dismissal motion, and bad faith notwithstanding, protecting the defendant is the court's primary concern. However, Rosenberg ignores the fact that the Rule is meant to protect the defendant from prosecutorial harassment, which implies bad faith or an improper motive. Dismissal followed by renewed prosecution in and of itself is not prohibited. Rosenberg regards the protection of the defendant from harassment and prosecutorial bad faith as separate and distinct concepts. The cases do not

support that contention. *See Salinas,* 693 F.2d 348, 351 (key factor in determining if dismissal constitutes or will result in harassment is prosecutor's good faith in making motion); *see also, United States v. Olson,* 846 F.2d 1103 (7th Cir.1988) (relying, in part, on good faith of prosecutor when assessing appropriateness of reindictment); *United States v. Del Vecchio,* 707 F.2d 1214 (11th Cir.1983) (proceeding on superceding indictment and dismissal of original indictment permissible so long as not brought for purpose of harassing defendant); *United States v. Fields,* 475 F.Supp. 903 (D.D.C.1979) (appropriateness of dismissal turned on finding of prosecutorial bad faith, namely that original indictment was obtained without sufficient evidence and for sole, and, therefore, improper purpose of securing defendant's cooperation against another); *but see, United States v. Poindexter,* 719 F.Supp. 6, 11 (D.D.C.1989) (drawing distinction between subjective good faith and objective harassment).

In the second line of cases, so Rosenberg's argument continues, the defendant consents to dismissal, but the court may deny the motion if it finds that it is contrary to public interest; in such cases, prosecutorial bad faith is often, if not always, the benchmark of a determination that a dismissal is contrary to public interest. However, in *N.V. Nederlandsche,* this Court refused to dismiss an indictment on the basis that the prosecution would be extremely costly and uncertain to succeed. Although there was no finding of bad faith and the reasons proffered were legitimate, the public interest in prosecuting the charges, which were "of the most grave

---

provide a statement of reasons for dismissal, but that the Supreme Court excised this provision from the final version. *Greater Blouse,* 228 F.Supp. at 490, note 8; *see also, Hamm,* 659 F.2d at 631, note 23 (commenting on same); *United States v. Ammidown,* 497 F.2d 615, 620 (C.A.D.C.1973) (suggesting that requirement of statement of reasons was replaced by the more demanding leave of court provision).

**20.** This Court reiterated its analysis in *United States v. N.V. Nederlandsche Combinatie Voor Chemische Industrie,* 428 F.Supp. 114 (S.D.N.Y.1977), holding that a court should exercise its discretion to protect both the defendant from harassing motions and the public interest.

and serious nature", outweighed the government's other concerns. *N.V. Nederlandsche*, 428 F.Supp. at 116–117.

 I am not persuaded that there are two distinct and exclusive approaches, dependent upon whether the defendant objects, to determining whether to grant leave of the court to dismiss an indictment. In fact, while the cases are clear that bad faith and the more nebulous concept of "contrary to manifest public interest" guide a court's inquiry, courts have differed on exactly how they define those factors and on which they rely. Moreover, Rosenberg's classification of the cases into two groups is too simplified a model and erroneously suggests that there are only two basic fact patterns that might present themselves. Arguably, there are at least two additional lines of cases, (i) in which the defendant does not object to dismissal, but does object to dismissal without prejudice; and (ii) in which the prejudice of dismissal to the defendant is not apparent at the time of dismissal and is only discovered upon the happening of subsequent events, e.g., a reindictment or, as in this case, the use of the dismissed charges in a parole hearing.[21] Since the leave of the court requirement included in Rule 48(a) is not defined, and since courts have employed various constructions, I consider the motivations of the prosecutor, the effects of dismissal, including whether the dismissal is with or without prejudice, on the defendant, and the public interest, more generally, when evaluating the

nolle.[22] The weight accorded to any one of these factors may vary with the facts of the case. For example, in a case where the defendant joins the motion to dismiss, a court need not consider the possibility that the defendant will be prejudiced. As to bad faith, in particular, I hold that, as a general rule, a finding of bad faith is not required, the defendant's objection to dismissal notwithstanding, but is a relevant, and sometimes determinative, factor in a court's evaluation of a motion to dismiss an indictment.

B. *In 1985, Dismissal Without Prejudice Was Appropriately Granted*

 Broadly stated, Rosenberg argues that the government abused the nolle by dismissing the indictment against her, thereby depriving her of the right to contest the evidence at trial, and then "raising the very same charges anew in a forum in which she was stripped of nearly every right and protection", (Defendant's Memorandum in Support of Motion, p. 2), in order to punish her for her alleged involvement in the Brinks conspiracy. Moreover, Rosenberg contends that the government's actions contravene both Judge Lacey's parole recommendations and my own treatment of dismissed Brinks charges with respect to Alan Berkman, who was indicted along with Rosenberg.

 When the government moved for dismissal in 1985, it stated that Rosen-

---

21. In *Greater Blouse*, 228 F.Supp. 483, the Court, contrary to Rosenberg's approach, considered the prosecutor's good faith even though one of the defendants objected to the dismissal. In defense of an anticipated attack on her theory, Rosenberg argues that the reasons for the defendant's objection did not arise from a fear of harassment, but because the indictment had the effect of stabilizing the blouse industry, which would be jeopardized by dismissal. Even if Rosenberg is correct that the Court was only considering the public interest and was not concerned with protecting individual defendants, it only highlights the many different factual scenarios possible and dictates against creating specific stan-

dards for each set of circumstances as opposed to adopting a more flexible standard.

22. This is not inconsistent with my decision in *United States v. Weiss*, 1993 WL 77285 (S.D.N.Y.1993), in which I employed a totality of the circumstances test, denying the government's motion to dismiss. Although I did not make a specific finding of bad faith, and although the opinion does not reveal the government's proffered reasons for making the motion, I seriously questioned the motives of the government. This factored into my refusal to dismiss the indictment, along with the potential hardship dismissal might visit upon the defendant.

berg's lengthy sentence for her New Jersey crimes rendered prosecution of the Brinks charges unnecessary. On its face, the government's proffered justification is sufficient for dismissal. "Neither the trial court nor this Court on appeal can substitute its judgment for the prosecutor's determination or can second guess the prosecutor's evaluation." *Salinas*, 693 F.2d at 351. Starting with a presumption of good faith, a decision to forego additional prosecution for reasons of judicial economy, and specifically, because the defendant has already been sentenced to a long prison term, constitutes more than a "mere conclusory interest" and is a substantial reason for dismissal. *Id.* at 352; *see also, United States v. Ammidown*, 497 F.2d 615, 620 (C.A.D.C.1973) ("court will not be content with a mere conclusory statement by the prosecutor that dismissal is in the public interest, but will require a statement of reasons and underlying factual basis .... [however] court does not have primary responsibility, but rather the role of guarding against the abuse of prosecutorial discretion.").

### 1. Dismissal With or Without Prejudice

Rosenberg has repeated throughout her briefs and at oral argument that she objected to the nolle. While it is undisputed that Rosenberg did object to the nolle being entered without prejudice, the present record does not support her contention that she objected to the dismissal itself. In his order denying Rosenberg's motion to have the nolle entered with prejudice, Judge Duffy explained that "[t]he defendant now moves that the Nolle be entered 'with prejudice' since she is fearful that she may be reindicted should she be successful in overturning her New Jersey conviction." There is nothing in the contemporaneous record to support the claim that Rosenberg urgently desired to go to trial and would prefer an immediate trial to a dismissal without prejudice and the mere possibility of a trial in the future.[23] Rather than insisting on contesting the Brinks charges in court, Rosenberg, understandably, wanted to ensure, if possible, that she would never be tried on the Brinks charges. Moreover, it appears that at that time Rosenberg credited the government's reasons for the nolle because, according to Judge Duffy's order, she only anticipated reindictment if the New Jersey conviction were reversed, reasoning that the government would pursue the Brinks charges if Rosenberg were no longer committed to a lengthy sentence, let alone any sentence at all.[24] Rosenberg does not truly contest the nolle in the first instance, but rather the alleged abuse of the nolle that began with AUSA Bartlett's November 8, 1994 letter to the Parole Commission.

Rosenberg's presently asserted preference regarding trial on the Brinks charges notwithstanding, Judge Duffy correctly denied Rosenberg's motion to enter the nolle with prejudice. Several circuits, including the Second Circuit, have recognized that a dismissal pursuant to Rule 48(a) is generally without prejudice. *See United States v. Ortega–Alvarez*, 506 F.2d 455, 458 (2nd Cir.1974); *see also, DeMarrias v. United States*, 487 F.2d 19, 21 (8th Cir.1973); *United States v. Chase*, 372 F.2d 453, 463–464 (4th Cir.1967). In fact, "it is precisely because a dismissal under Rule 48(a) does not bar a subsequent prosecution that the rule requires the consent of the court." *United States v. Davis*, 487 F.2d 112, 118 (5th Cir.1973). In denying Rosenberg's motion, Judge Duffy reasoned that there was no case or controversy.[25] At the time the order was entered, Rosenberg was not

---

**23.** As previously mentioned, neither insistence on being arraigned nor a consolidation motion, both of which predate the government's motion to dismiss the indictment, can fairly be characterized as an objection to the nolle.

**24.** It is not clear that had the New Jersey conviction been reversed, it would have been improper for the government to reindict Rosenberg on the Brinks charges if it chose to do so. However, I do not decide that issue for that state of events never came to pass.

**25.** *But see. United States v. Poindexter*, 719

aggrieved. *Cf., Parr v. United States,* 351 U.S. 513, 76 S.Ct. 912, 100 L.Ed. 1377 (1956) (holding defendant has no right to appeal dismissal unless and until reindicted and convicted); *Lewis v. United States,* 216 U.S. 611, 30 S.Ct. 438, 54 L.Ed. 637 (1910) (defendant not legally aggrieved by nolle prosequi and, therefore, had no right to appeal). Even had she been reindicted, Rosenberg might not have been legally aggrieved as reindictment is appropriate under some circumstances. Accordingly, there was no reason to completely foreclose the possibility of renewal. On the other hand, as previously noted, prosecutorial bad faith and/or prejudice to the defendant, which renders further prosecution unfair or improper, may not be discovered until some time after the dismissal. However, that is precisely the reason why Rosenberg's argument that subsequent prosecution should be prohibited was premature, and why the issue is properly before me now.[26]

### 2. Were The Government's Proffered Reasons for Dismissal its Real Reasons?

Although, on their face, the government's reasons for dismissal were substantial, Judge Weinfeld said in *Greater Blouse* that the court must also be satisfied that the proffered reasons are "the real grounds upon which the application is based." *Greater Blouse,* 228 F.Supp. at 486. Rosenberg maintains that the government's stated bases for the nolle were falsehoods.

Rosenberg argues first that the government was not really concerned with preserving government resources. She notes that the government intended and, in fact, proceeded with a second Brinks trial, and also that the government did not nolle a separate case against Rosenberg pending in Washington, D.C. on bombing conspiracy charges related to her New Jersey crimes. However, as the government rightly points out, "[e]very defendant in every case constitutes a separate burden on the justice system. Each is treated separate and apart from her co-defendants; each files motions ... that must be responded to and decided; each exacts a separate toll on trial resources by jury addresses, cross-examination, the presentation of evidence and the submission of

F.Supp. 6. Although it acknowledged that "there remains a strong presumption in favor of a no-prejudice dismissal," *id.* at 10, the district court in *Poindexter* entered a nolle with prejudice. In that case, the government sought to dismiss only certain counts of the indictment, while proceeding on the remaining counts. The reasons the government had for dismissing certain counts were that its investigation was incomplete, some information was then classified, and certain witnesses then protected by the privilege against self-incrimination might later be available to testify, It was the government's picking and choosing among counts and the possibility of subjecting the defendant to multiple trials that figured largely into the decision to dismiss with prejudice. The court admitted that there was little precedent on how to proceed in those circumstances, and all the cases it relied upon reasoned that the dismissal should be with prejudice only upon reindictment and with the benefit of hindsight. Similarly in *United States v. Derr,* 726 F.2d 617 (10th Cir.1984), the court dismissed a second indictment where the first indictment was dismissed because the government was not

prepared to proceed. Such are not the circumstances in the case at bar. Here the government's dismissal was not based on a lack of preparation or desire to postpone trial until its case became stronger, and Rosenberg was not harassed by being subjected to the possibility of multiple trials, let alone any trial.

**26.** I further note that whether Judge Duffy was correct in entering the nolle without prejudice is now, in effect, moot. Rosenberg was never reindicted and never will be since, by the government's own admission, the statute of limitations has expired. In addition, Rosenberg does not argue that she is entitled to relief because for several years she had to live with the possibility of reindictment. Finally, even had the nolle been entered with prejudice, the events that have led to the current motion, namely the government's letter to the Parole Commission and the denial of early release, could have and would have occurred. As a result, this Court would find itself in the same position and be faced with the same issue as it is today.

... applications for relief; each, upon conviction has a separate right to appeal ... and each may collaterally attack every separate conviction [by habeas petitions]." (Government's Memorandum of Law, p. 48). The fact that the government was prepared to try other defendants on the Brinks charges, standing alone, does not mean that trying Rosenberg would come at no extra cost. The prosecutor traditionally has and continues to be the best judge of how to allocate his office's resources.

The fact that the government was pursuing other charges against Rosenberg in Washington, D.C., which were later dismissed on double jeopardy grounds, does no more to support Rosenberg's contention. It cannot be disputed that trying Rosenberg in both D.C. and New York would have been more costly than trying her in just one of those forums. Therefore, the decision to dismiss the Brinks charges, but maintain the D.C. charges, does not belie the government's interest in conserving resources. On the contrary, the fact that the D.C. charges were related to the New Jersey crimes, for which Rosenberg had already been tried, made it more likely that between the D.C. charges and the Brinks charges, the D.C. case would require less expenditure. The Brinks charges were unrelated and would require the government to start from scratch regarding its preparations as to Rosenberg. Finally, although there is only one federal government, the reality is that there are many United States Attorney's Offices. It is unlikely that the same prosecutors were handling the Brinks and D.C. charges, let alone the same office. Therefore, any evaluation of the validity of the government's proffered reasons for dismissal in one case can hardly be informed by the government's actions in another case in a different district and circuit. To the extent that the government's handling of the Brinks and D.C. indictments are inconsistent, it is not enough to overcome the presumption of good faith afforded this District's prosecutor in moving to dismiss.

Even Rosenberg does not seriously contend that the government dismissed the Brinks charges with the intention from the start of later using those charges to deny her parole, knowing full well that she would be less equipped to defend herself in a parole hearing as opposed to at trial. This conspiracy theory is farfetched and there is no evidence that the government ever had such a purpose in mind, and certainly not when it moved to dismiss the Brinks indictment. In fact, given the way Rosenberg behaved at the New Jersey trial and sentence, and in light of Judge Lacey's recommendation and warning to the Parole Commission about releasing Rosenberg, the government likely did not expect that Rosenberg would be seriously considered for parole only 15 years into her 58 year sentence.

Nevertheless, Rosenberg still maintains that the government was insincere in the reasons it gave for the nolle. She theorizes that the government's case against her was weak; rather than see Rosenberg's case be consolidated with the trials of Alan Berkman and Marilyn Buck, lest the lack of evidence against Rosenberg be highlighted by the stronger cases against the other defendants, the government dismissed the indictment. This theory necessitates that I make two assumptions: (i) that the evidence against Rosenberg was indeed weak, or, at least, that the government deemed it so; and (ii) that based on that belief, the government was willing to lie to the court in order to avoid consolidation at all costs. However, this attack on the government's good faith also stretches credibility.

Although the motion to dismiss the case against Rosenberg did follow the consolidation motion, that alone proves nothing. If the government was merely opposed to consolidation, it could have opposed that motion, as it did regarding the remaining defendants. If the motion was granted in spite of the government's opposition, the government still could have sought dis-

missal as a last resort. Moreover, as I remarked at oral argument, "my experience has been that the defendant who regards himself or herself as having much less evidence asks for a severance, not a consolidation." (Tr. p. 26).

Rosenberg countered by suggesting that the jury could not ignore the striking contrast between the overwhelming evidence against Buck and the dearth of evidence against Rosenberg. Even accepting that possibility, and without debating trial strategy and the seemingly considerable risks of implementing that particular strategy, Rosenberg fails to explain why she not only wished to consolidate her trial with Buck's, but to ally herself with Buck. After all, the two defendants were both represented by the same attorney, Susan Tipograph, and would necessarily be viewed together in the eyes of the jury. Therefore, either Buck and Rosenberg contemplated a unified defense, or, if Rosenberg truly intended to distinguish herself from Buck, so that the stronger the case against Buck, the weaker the case would appear to be against Rosenberg, Tipograph would have faced an irreconcilable conflict of interest.

Speculation aside, the record does not support the contention that the government feared consolidation [27] or that it considered the evidence against Rosenberg as weak. The mere fact that the government's motion to dismiss followed on the heels of Rosenberg's motion to consolidate is simply not enough. That Rosenberg contests the evidence, and may be able to cast doubt upon certain aspects of the government's case, does not mean that Rosenberg's version is more persuasive, or, more importantly, that the government found it more persuasive. The prosecutor has an independent obligation not to indict where there is insufficient evidence to support a conviction and to see that justice is

served, not to secure convictions for the sake of winning. That duty, coupled with the presumption of good faith, and the lack of anything more than mere speculation and possibility, makes it impossible for me to adopt Rosenberg's theory that the government dismissed the case for reasons other than those stated.

In light of the foregoing, I hold that the dismissal without prejudice was valid at the time the nolle was entered. However, the inquiry does not end there.

## C. *AUSA Bartlett's 1994 Letter to the Parole Commission*

■ The main thrust of Rosenberg's argument surrounds the propriety of the government's letter to the Parole Commission. Rosenberg contends that the letter constituted an abuse of the nolle and runs afoul of the instructions of two district judges, namely Judge Lacey and myself.

### 1. *The Government's Letter Was Not Precluded by Judicial Decree*

Rosenberg emphasizes Judge Lacey's pronouncement that "in sentencing I'm giving no consideration to Rosenberg's involvement, if any, in the acts and crimes charged in the Southern District of New York ... my sentence here is not based in the slightest on any involvement that Rosenberg may have had in what is there charged." (Tab 4, p. 46). From this Rosenberg reasons that Judge Lacey intended that the Parole Commission not consider her alleged involvement in the Brinks conspiracy in any way.

As previously explained, I question Rosenberg's interpretation. *See* discussion *supra* Part I.B. Simply because the alleged offenses were not part of the calculation of the actual sentence does not mean they may not be considered in determining release on parole. The Second, Sixth, Seventh, Eighth, Tenth and Eleventh Circuits

---

**27.** That the government might have legitimate reasons, other than fear, to oppose a consolidation motion is evidenced by the reasons stated with respect to Berkman. *See* discussion *supra*, note 7. In fact, as noted above, I denied the motion to consolidate as to the remaining defendants.

"have reached the conclusion that the Commission may consider information that the sentencing judge determined ... to exclude from his or her sentencing consideration." *Lewis v. Beeler,* 949 F.2d 325, 331 (10th Cir.1991); *see also, Ochoa v. United States,* 819 F.2d 366, 372 (2nd Cir. 1987) ("While such a disclaimer may reasonably be thought of as a flag of caution to the Commission, we see no sound basis for holding that due process or any other applicable precept requires the Commission to give the disclaimer preclusive effect."); *Hackett v. United States Parole Commission,* 851 F.2d 127, 131 (6th Cir. 1987); *Kramer v. Jenkins,* 803 F.2d 896, 900 (7th Cir.1986); *Blue v. Lacy,* 857 F.2d 479, 481 (8th Cir.1988); *Coleman v. Honsted,* 908 F.2d 906, 907–08 (11th Cir.1990). In fact, Judge Lacey expressed great concern and urged extreme caution regarding early release for Rosenberg, because of both Rosenberg's potential future dangerousness, which admittedly the Parole Commission determined was no longer a factor, and her lack of remorse. In a way, the Parole Commission followed Judge Lacey's advice by considering everything. However, I need not speculate about what Judge Lacey truly meant. Even if Rosenberg is correct, Judge Lacey's statement regarding the Brinks crimes amounts to no more than a recommendation. The Parole Commission's decision not to follow it is hardly a violation of Rosenberg's rights. See 28 C.F.R. § 2.19(d).

Rosenberg also relies on my "directive" regarding the Parole Commission's consideration of unproven Brinks allegations with regard to Alan Berkman as grounds for her belief that her parole determination has been tainted. However, Rosenberg overstates my holding with respect to that defendant. Berkman was one of several defendants indicted along with Rosenberg for the Brinks crimes. As with Rosenberg, but for different reasons which

are not relevant here, Berkman was never tried for his alleged involvement in the Brinks conspiracy. Nonetheless, I did have occasion to sentence Berkman on other charges. At the sentencing, I expressly stated, as did Judge Lacey when he sentenced Rosenberg, that I was not considering the Brinks allegations. However, in response to Berkman's motion to strike the allegations from the presentence report, I held that deletion was not required "so long as the fact of the dispute and the judge's non-reliance appear on the record and the sentencing transcript is attached to the presentence report." [28] *United States v. Berkman,* 1988 WL 56708 (S.D.N.Y.1988).

When Berkman was considered for parole, the Commission relied on my decision not to strike the allegations as a basis for finding by a preponderance of the evidence that Berkman was involved in the Brinks conspiracy and that those crimes should be considered in assessing the offense severity rating. *See United States v. Berkman,* 1990 WL 155721, at *5 (S.D.N.Y.1990). In response to Berkman's application for relief, I stated:

> The whole purpose of the course of action which I followed at sentencing, sanctioned by the court of appeals, is to free the defendant, as he proceeds through the correctional system, of any onus or prejudice resulting from unproven government allegations which the trial court specifically refused to consider at the time of sentencing. The Parole Commission's processing of Berkman's case appears to stand that salutary policy on its head. I would expect the Parole Commission to reflect upon these views in any subsequent proceedings involving Berkman.

*Id.*

Contrary to Rosenberg's assertion, my actions with respect to Berkman do not

---

**28.** There is no indication on the present record that Rosenberg ever moved to strike the Brinks allegations from her presentence report prepared in connection with her New Jersey conviction. Nonetheless, Judge Lacey's declination to consider those allegations and Rosenberg's denial of those allegations were made clear to the Parole Commission.

stand for the proposition that the Parole Commission was precluded from considering the unproven Brinks allegations when determining the appropriateness of parole from a sentence for an unrelated conviction.[29] In *Berkman,* the Parole Commission misconstrued my decision not to delete the Brinks allegations from the presentence report. The Commission erroneously interpreted my refusal to strike the Brinks information as an indication that the allegations were accurate. However, my decision was actually based on Second Circuit precedent which provided that disputed statements are not generally deleted so long as the court's non-reliance is noted. In fact, I expressly declined to make a finding regarding the accuracy of the disputed statement. Therefore, the Commission's determination that Berkman's involvement in the Brinks conspiracy was supported by a preponderance of the evidence may have been erroneous, and it was for this reason that I criticized its actions.[30]

In the case at bar, the Parole Commission appears to have made an independent determination regarding the sufficiency of the evidence proving that Rosenberg was a part of the Brinks conspiracy. Accordingly *Berkman* is distinguishable. Whether in the case at bar the Parole Commission should have considered the Brinks crimes and for what purpose, and if so whether its determination constituted an abuse of discretion, may be at issue, but that constitutes an attack on the Parole Commission itself and is not properly before me. *See* discussion *supra* Part II.B. Contrary to Rosenberg's assertions, the government's letter to the Parole Commission was not precluded by any statement or holding

made by either Judge Lacey or myself. Thus, in that sense, there was no abuse of the nolle on the part of the government.

## 2. *Renewed Prosecution?*

Rosenberg's principal argument is that in contravention of Rule 48 the government abused the nolle and harassed her by dismissing the Brinks charges and "subsequently commencing another prosecution [by letter] at a different time or place [in front of the Parole Commission] deemed more favorable to the prosecution." *Salinas,* 693 F.2d at 351. There is certainly precedent holding that a court may preclude renewed prosecution by dismissing a second indictment where its prosecution constitutes harassment. See, e.g., *Derr,* 726 F.2d 617 (dismissing second indictment where government had not provided sufficient reason for dismissal of original indictment); *Salinas,* 693 F.2d 348 (dismissing second indictment where government brought renewed prosecution in order to obtain more favorable jury); *Fields,* 475 F.Supp. 903 (second indictment dismissed where original indictment obtained without sufficient evidence to convict thereby constituting harassment of defendant); *cf. Poindexter,* 719 F.Supp. 6 (requiring that dismissals be entered with prejudice where government sought dismissal merely to strengthen its case and defendant would be exposed to the threat of multiple prosecutions). Rosenberg contends that the same reasoning which authorizes courts to preclude reindictment should extend to situations, as in the case at bar, where a prosecution is renewed at a parole hearing. The basic premise for her argument is that the government's actions

---

**29.** Stated more generally, Rosenberg cites no authority for the proposition that the Parole Commission is precluded from considering conduct not considered by the court during sentencing.

**30.** Regarding appropriate relief, I note that although I held that the Parole Commission erroneously attributed weight to my decision not to strike the allegations when assessing the Brinks offenses, I did nothing more than

state that "I would expect the Parole Commission to reflect upon these views in any *subsequent* proceedings involving Berkman." *Berkman,* 1990 WL 155721 at 5 (emphasis added). Consequently, my holdings with respect to Berkman do not serve as precedent for the type of relief sought by Rosenberg, to wit, a new parole hearing or immediate release.

in this case, specifically the letter to the Parole Commission, should be regarded as the functional equivalent of a prosecution. I am unable to accept that premise.

As already discussed, Rosenberg's motion is not dependent on a finding of prosecutorial bad faith. Nevertheless, I will analyze the government's intentions as part of the totality of circumstances. I begin by emphasizing that the government's letter was written in response to a specific request from the Parole Commission for the information contained therein. Therefore, at the outset, the suggestion that the government with malice aforethought actively sought to renew the prosecution against Rosenberg, and thereby gain a tactical advantage by virtue of the fewer procedural protections afforded a prospective parolee, does not fit the facts.

Nevertheless, Rosenberg views the government's statement at the time of the nolle that it was satisfied with Judge Lacey's sentence, and its subsequent recommendation in its letter to the Parole Commission that Rosenberg not be paroled due to her involvement in the Brinks crimes, as fundamentally inconsistent. According to Rosenberg, the government has, in effect, gone back on its word. I disagree. The government chose not to try Rosenberg for the Brinks crimes in light of the lengthy sentence she received from Judge Lacey. Contrary to Rosenberg's assertion, and given that the length of Rosenberg's sentence for her New Jersey crimes was the basis on which the government dismissed the Brinks indictment, the government's opposition to an early parole was consistent, not inconsistent, with its previously expressed view.

I reiterate that the government only wrote its letter in response to a request by the Parole Commission. Thus, it was not the prosecutor, but rather the Commis-

sion, that awoke that sleeping dog named Brinks. Although by forgoing trial on the Brinks crimes the government necessarily accepted the risk that Rosenberg might be released on parole earlier than anticipated, the government never promised explicitly or by implication that it would not oppose early release. It would be an entirely different matter had the government attempted in spite of the existing 58–year sentence to reindict Rosenberg for the Brinks conspiracy, and thereby attempt to obtain a conviction and secure an additional sentence.

Rosenberg would have this Court disregard the distinction between an inmate, currently serving a sentence, being separately sentenced on a separate conviction, thereby increasing the maximum number of years to be served, and the denial of parole, which does not affect the length of the sentence, but rather the actual time served. This I will not do. Although he chose not to do so, Judge Lacey could have considered Rosenberg's alleged involvement in the Brinks conspiracy when calculating the sentence for Rosenberg's New Jersey conviction.[31] *See Billiteri v. United States Board of Parole*, 541 F.2d 938, 944 (2nd Cir.1976) ("this court has uniformly held that a sentencing judge has wide latitude in taking into consideration all matters bearing upon the personal history and behavior of the convicted accused, and this is by no means confined to the defendant's conduct in connection with the offense for which he was convicted"). The fact that he did not does not preclude consideration of those offenses in the future.[32] *See Lewis*, 949 F.2d at 330 ("it is clear that the Commission can consider information that the sentencing judge declined to consider"); *see also*, discussion *supra* Part III. C.1.

---

**31.** Had Judge Lacey done so, Rosenberg would have, in effect, been sentenced, in part, based on crimes for which she was neither tried nor convicted.

**32.** In such circumstances, consideration of the alleged offenses has the less severe, albeit still profound, effect of denying release from a predetermined sentence as opposed to increasing the length of the sentence itself.

The Parole Commission asked the government whether the Brinks charges were prosecuted, and if not, why not. The government stated they were not, explained that the charges were dismissed, and reiterated the reasons it stated in its motion to nolle the indictment. In the span of two paragraphs, the Parole Commission also requested the government to "provide details of [Rosenberg's] involvement," to "define her role," to "provide details of her role," and to answer "whether there was evidence which would support the charges." The Parole Commission further informed the government that Rosenberg's hearing would be delayed pending receipt of the government's response. Accordingly the government responded.[33] With the exception of the last three paragraphs of the government's letter, in which the government made a strong recommendation against parole, the government did no more than provide the information requested of it by the Parole Commission.

Regarding the last three paragraphs, although the recommendation was unsolicited, the Commission welcomes recommendations from, among others, prosecutors and other interested parties. *See* 28 C.F.R. § 2.19(d). In addition, as explained below, federal prosecutors provide recommendations to the Commission as a matter of practice. Although the last three paragraphs of the government's letter sound much like a closing argument, AUSA Bartlett's impassioned plea that parole be denied remained only a non-binding recommendation. *Id.* The failure, if any, of the Commission to treat it as such is not attributable to the government, and does not justify a decision precluding the office of

the prosecutor from submitting its recommendation. As further explained below, the strong opinions expressed in the letter, in and of themselves, do not rise to the level of a prosecution.

The Commission's request instructed the government to "note on your response that this is an 'Appendix G Response.'" According to information provided by the Commission's General Counsel's Office in Maryland, "Appendix G" refers to a now defunct section of the Commission's Internal Guidelines Manual. However, the term is still used to earmark and distinguish submissions that are responses to specific requests by the Commission for information from unsolicited submissions.

During oral argument, counsel for Rosenberg referred to the government's letter as the "Appendix G letter," and asserted that what the Parole Commission wanted was a "792 form, the form that a prosecutor is obligated to fill out when there is a conviction of more than a certain length of time to give their views to the Parole Commission." (Tr. p. 48). For those defendants not sentenced pursuant to the Sentencing Guidelines, federal prosecutors were "required to prepare a Form 792 'Report on Convicted Prisoners by United States Attorney' in all cases in which a defendant has been sentenced to a prison term in excess of one year." (U.S. Attorney's Manual, 9–34.000). Notably, Form 792 includes information about the offense of conviction, related charges, including unadjudicated charges, the prisoner's prior history and criminal reputation, and an optional recommendation by the prosecutor regarding parole.[34]

---

**33.** Had the government not responded in the manner requested, Rosenberg's parole hearing might have been further delayed.

**34.** It is not clear whether Form 792 is intended only to include information about the offense of conviction and related conduct, or whether it should include information about unrelated offenses as well, perhaps as part of the prisoner's history and criminal reputation. This distinction is discussed further in Part III.D., *supra.* Interestingly, the "Sample

Letter Requesting Form 792," included in the Parole Commission's Internal Guidelines Manual, states: "Under its regulations, the Commission must consider the nature and circumstances underlying the defendant's offense behavior, including behavior beyond the offense of conviction if there is substantial evidence that such additional criminal conduct occurred." (Commission's Internal Guidelines Manual, p. 217). However, the Instructions For Completing Form 792 state

An internal Parole Commission memorandum in Rosenberg's file, dated July 27, 1994, documents the reason for the delay of her initial parole hearing as "Records Incomplete." The memorandum explains that the Commission "needs letter / 792 from Southern District of New York regarding Bank Robberies in which people were killed. Charges were never prosecuted. We need to know why and what, if anything the government could prove. Critical to Offense Severity Rating." Based on this notation, Rosenberg's counsel concluded that what the Commission was, in fact, requesting from the government was a 792 Form.

The government concedes that an "Appendix G Response" is often similar to a Form 792, and sometimes is prompted by the failure of the prosecutor to file a Form 792 or for the purpose of supplementing a Form 792. The government also concedes that Form 792 is generally filled out by the attorney who prosecuted the offense of conviction. However, the government maintains that the Commission may seek information, thus prompting an "Appendix G Response" from any source, including but not limited to the attorney who prosecuted the offense of conviction.

In the present case, the Commission's actual request to the government made no reference to Form 792, and there is no reason to believe that the government was privy to the Commission's internal memorandum. Moreover, the reference to Form 792 in the Commission's internal memorandum suggests only that the Commission sought the equivalent of a Form 792 for the Brinks crimes. Because Rosenberg was not convicted of those crimes, the Commission did not actually request a Form 792, which is only prepared in connection with a conviction, but rather specific information concerning Rosenberg's involvement in the Brinks conspiracy. Therefore, to the extent that

there are limitations governing the scope of information regularly included in Form 792 and that only the attorneys who prosecuted the offense of conviction are authorized to complete this form, these restrictions do not apply to the government's letter. There is no doubt, based on the Commission's internal memorandum of July 27, 1994 and the actual request for information addressed to the Southern District United States Attorney's Office, that the Commission wanted and believed it was entitled to consider information concerning the Brinks crimes. Moreover, the Commission deemed that information "[c]ritical to Offense Severity Rating."

When asked during oral argument how the government should have responded to that request, counsel for Rosenberg suggested three possible answers. First, counsel said that ideally the government should have simply replied that Rosenberg was convicted in the District of New Jersey for New Jersey crimes. On that scenario, the Parole Commission's inquiry would have been directed to the United States Attorney's Office in that district and relate only to the New Jersey offense. This suggestion might have had more force had the Commission simply requested a Form 792, which is regularly submitted by the attorney who prosecuted the offense of conviction. Instead, it requested detailed information about Rosenberg's involvement in the Brinks conspiracy, which this District's United States Attorney's Office was uniquely equipped to provide. To the extent that Rosenberg disputes the Commission's right to request and consider such information, her claim concerns a violation of parole procedures by the Commission itself, and falls outside the scope of the present motion.

Secondly, counsel for Rosenberg suggested that the government, speaking through the United States Attorney for this District, should have explained that in

that "the Parole Commission is entitled to consider unadjudicated charges," but says this only in reference to an instruction to

"[o]utline related charges." (U.S. Attorney's Manual, Title 9–1299).

light of its decision to dismiss the indictment and its satisfaction with Judge Lacey's sentence, the Brinks allegations were not relevant to the Commission's decision on Rosenberg's parole. (Tr. p. 49). However, since it is the Parole Commission that is charged with determining parole eligibility, it is the Commission's function to determine what is and is not relevant. *See* 28 C.F.R. § 2.13 ("The hearing examiner shall limit or exclude any irrelevant or repetitious statement."); *see also*, 18 U.S.C. § 4207 ("There shall also be taken into consideration such additional relevant information concerning the prisoner ... as may be reasonably available."); 28 C.F.R. § 2.19(b)(1) ("The Commission encourages the submission of relevant information concerning an eligible prisoner by interested persons."). Contrary to Rosenberg's suggestion, it seems clear enough that the government would have been remiss in refusing to provide the Parole Commission with the information it requested. "Any information which can inform the [Parole] Commission's decision and which it finds helpful may be considered. Determining the relevance and weight to be accorded these myriad factors is placed solely within the province of the [Commission's] broad discretion." *Lofranco v. United States Parole Commission*, 986 F.Supp. 796, 806 (S.D.N.Y.1997), *aff'd*, 175 F.3d 1008 (2nd Cir.1998) (unpublished disposition) (internal citations and quotations omitted).

Finally, Rosenberg's counsel contended that even if the Commission's request warranted a substantive response, the government should have given an impartial summary of the evidence, including references to evidence which might cast doubt upon her participation in the Brinks crimes. (Tr. p. 49–50). But the relevant statutes and regulations regarding the type of information considered by the Parole Commission, namely 18 U.S.C. § 4207 and 28 C.F.R. § 2.19, do not require, and Rosenberg cites no authority for the proposition,

that relevant information provided by the prosecutor, or anyone else for that matter, must be balanced or impartial. While the prosecutor is under a continuing obligation not to make any false statements or misrepresentations, there is no apparent reason why the prosecutor should not be permitted to present the government's view of the evidence, especially when specifically asked to do so.[35] Of course, the weight accorded the prosecutor's statement must be measured against the defendant's objections and version of events and the other materials considered by the Commission. However, "the district court does not serve as a screening agency between the United States Attorney and the Bureau of Prisons concerning post-sentence communications." *United States v. Russo*, 1991 WL 3021 (S.D.N.Y.1991); *see also*, *United States v. Robilotto*, 867 F.2d 729 (2nd Cir. 1989) (holding that district court has no jurisdiction under Fed.R.Crim.P. 32 to entertain challenge to post-sentence communications between the prosecution and the Bureau of Prisons and the Parole Commission); *United States v. Freeny*, 841 F.2d 1000 (9th. Cir.1988) (although district court has no jurisdiction under either Fed. R.Crim.P. 32 or 35 to assess accuracy of post-sentence report, defendant may contest such information in front of the Parole Commission pursuant to 28 C.F.R. §§ 2.19(c) and 2.26(e)(4)).

To further evaluate the purpose and effect of the government's letter, it must be properly placed in context. Rosenberg suggests that the government's unfairly skewed, as she perceives it, version of events and presentation of the evidence is all the Commission had before it. Left with this supposedly one-sided account of the Brinks conspiracy, Rosenberg implies that the Parole Commission had no choice but to accept the allegations as true. However, as previously explained, the government's letter was not binding on the

---

**35.** Although Rosenberg maintains that the government had an obligation to present the evidence in a neutral manner, she does not allege that the government provided false evidence or that it expressly vouched for the credibility of its witnesses.

Commission and was subject to a finding by the preponderance of the evidence. In addition, in accordance with her rights, Rosenberg did challenge the Brinks charges at the parole hearing, albeit unsuccessfully. Rosenberg seems to discount the fact that the government's letter was only one of several submissions made to the Commission, a number of the others being on her behalf. *See, e.g.,* Tab 11, Letter from Anne Marie Raftery, Chaplain, FCI Danbury (testifying to Rosenberg's rehabilitation, her creation of an inter-faith, bilingual library system, her participation in AIDS support programs and her role as history teacher); Tab 20, Letter from Judith L. Holmes, Esq., one of Rosenberg's former attorneys (attacking credibility of witness against Rosenberg and illustrating lack of evidence); Tab 22, Letter from Mary K. O'Melveny, Esq. (same). It is also important to point out as well that Rosenberg was represented by an attorney at her initial hearing. Both Rosenberg and her attorney were given a chance to respond to the allegations, and to raise any questions or doubts regarding the evidence against her. At the subsequent hearing on remand, Rosenberg was represented by Dr. Chip Gibson, the chief psychologist at FCI Danbury, who testified directly to Rosenberg's inspiring, virtually miraculous change in attitude, her substantial contributions to AIDS awareness programs, and her effectiveness in assisting new prisoners to adjust and adapt to prison life. "Dr Gibson strongly recommend[ed] favorable parole action in her case." (Tab 9, p. 4).

Rosenberg stops just short of inviting this Court to reassess the evidence regarding her involvement in Brinks and to review de novo the decision of the Parole Commission. The problem of jurisdiction, *see* discussion *supra* Part II.B., notwithstanding, and even were I so inclined to conduct a hearing of this sort, the reassessment of the Commission's decision would necessarily be limited. As I have had occasion to say in another case:

"Congress has vested broad discretion in the Commission to determine parole eligibility. Its discretion, of course, is constrained by the due process clause, but federal judicial review of Commission determinations is narrow. Courts will not reevaluate the credibility of information before the Commission or the relative weight given the evidence. The Commission's decision will only be upset if it was arbitrary or capricious, or constituted an abuse of discretion. [A] court may not substitute its own judgment for that of the Commission ... but may consider only whether there is a rational basis for the Commission's decision."

*Masselli v. U.A. Parole Commission,* 1986 WL 6493, at *1 (S.D.N.Y.1986) (internal citations and quotations omitted); *see also, Williams,* 556 F.2d at 1153, 1155 ("a denial of parole, based on a facially reasonable ground, is not subject to review by a federal court"); *Billiteri,* 541 F.2d at 944.

Notwithstanding all these considerations, Rosenberg argues that the government responded to the Parole Commission's request for information in a wholly unacceptable manner: as a practical matter, she contends, the government *prosecuted* her on the Brinks charges. Certainly a parole hearing is not the proper forum for a renewed prosecution, and indeed, if that is what occurred, it would amount to harassment of the defendant and constitute an abuse of the nolle. There are two cases cited by Rosenberg which provide the strongest support, albeit not strong enough, for her argument.

In *Government of Virgin Islands ex rel. Robinson v. Schneider,* 893 F.Supp. 490 (D.Virgin Islands 1995), after dismissing a prosecution in the federal district court, a conviction in that court having been reversed and remanded, the government sought to re-file the identical charges in the territorial court. In response to the defendant's habeas corpus petition, the district court held that the government was precluded from going forward with the

second prosecution. The court relied, in large part, on the fact that the reinstatement of the case in the territorial court had the unjust result of depriving the defendant of certain statutory protections available in the district court. Although this appears to support Rosenberg's contention that the government is prohibited from renewing prosecution in a more advantageous forum, the court expressly limited its holding to the facts before it, stating that "[w]hether the government should be able to reprosecute in the Territorial Court after a voluntary dismissal in this Court must be decided on a case by case basis and depends" on a combination of factors. *Government of Virgin Islands ex rel. Robinson*, 893 F.Supp. at 497.

The particular circumstances in *Government of Virgin Islands ex rel. Robinson* differ significantly from the case at bar. First and most importantly, unlike the current case, there is no question that at the time of the dismissal the government contemplated specifically a reprosecution. Second, the defendant in that case had already been tried once before on the underlying charge, and thus would be subjected to multiple trials. Third, the court was primarily concerned with the government's apparent attempts to circumvent the applicable speedy trial provisions which attached in the district court, but not the territorial court. The unique relationship between the district and territorial courts was particularly important. The court held that, unlike the state and federal governments, the federal and territorial governments are not separate sovereigns. Consequently, "the government may not pass the defendant to the left arm when the right arm is about to be shackled." *Id.* However, the dynamic between the district and territorial courts, which are both forums for prosecution established for similar purposes, is hardly analogous to that between the courts and the Parole Commission, which have very distinct missions. Fourth, the court determined that the reasons proffered in support of the dismissal were not substantial, and, moreover, did not indicate any intention on the part of the government to renew the prosecution. Thus, when the government immediately refiled the case, its good faith in moving for the dismissal was called into question. For these reasons, the court held that reprosecution in the territorial court would be unjust in that particular case. In the case at bar, the government's proffered reasons for dismissal were legitimate, and have not been called into doubt by subsequent events. Moreover, *Government of Virgin Islands ex rel. Robinson* had nothing to do with, and therefore the court did not address, how dismissed charges are to be treated for purposes of determining parole eligibility.

*Maddox v. Elize*, 83 F.Supp.2d 113 (D.D.C.1999), is facially more on point. In *Maddox* the defendant, who was on parole from an unrelated conviction, was charged with being a felon in possession of a firearm. Subsequently, Maddox was tried three times on the possession charge. The first trial ended in a mistrial, the second ended in conviction which was overturned, and the third resulted in acquittal. Undeterred by the three unsuccessful prosecutions, the government sought to revoke the defendant's parole on the basis of the alleged possession offense. After a revocation hearing in which the prosecutor played a significant role, the defendant's parole was revoked. Having determined that the Assistant United States Attorney, in effect, prosecuted the case against the defendant at the revocation hearing, the court ordered a new hearing severely restricting the United States Attorney's Office's involvement.

Since the circumstances in *Maddox*, namely a prosecution in the guise of a parole hearing, are essentially what Rosenberg alleges happened here, I quote at length from the district court's decision explaining its holding:

> The Court does not mean to usurp the power of the D.C. Parole Board to decide matters legitimately prosecuted by

the Board and its staff. Indeed, the Court is well aware of the differences between a criminal prosecution and a parole revocation hearing. There are different standards of proof and evidence, and the sanctions imposed serve different purposes. The Court is not attempting by its decision to indicate that an acquittal in a criminal case negates the possibility of a parole revocation. What this Court is saying is that the government cannot use the forum of a parole revocation hearing to retry a defendant as part of a vindictive action to jail someone the government believes to be a bad person particularly because that person has exercised his right to a jury trial.

The Court has no quarrel with representatives of the United States Attorney appearing as witnesses at parole revocation hearings. Indeed, their intimate knowledge of the evidence may, in appropriate circumstances, be of great value to the Parole Board. It is only where the government exceeds these limits where it runs into trouble. Once it takes on the role of prosecuting parole violation cases after a jury has acquitted the defendant, it opens itself up to the charge of vindictiveness.

*Maddox*, 83 F.Supp.2d at 122.

In *Maddox*, not only did the prosecutor attend the hearing, he assumed control of it. He called and cross-examined witnesses, introduced and objected to evidence, suggested that the defense witnesses at trial were liars, instructed the Parole Board on the law, and presented closing statement type arguments, not to mention the fact that the government had already subjected the defendant to three unsuccessful trials. In addition, prior to the hearing the AUSA participated in an ex-parte meeting with the members of the Parole Board. On the basis of the AUSA's unsolicited appearance and adversarial posture, the court deemed the prosecutor's actions vindictive. The court did not object to a prosecutor's involvement in a parole hearing per se, but rather the fact that the parole hearing was transformed, by the AUSA, into a prosecution.

Whereas the AUSA in *Maddox* clearly crossed the line, the government in the present case did not insert itself into and take over the parole proceedings. The government's involvement was limited to the 1994 letter which was written, at least in part, in response to a request by the Parole Commission for the information provided therein. No representative of the United States Attorney's Office attended the hearing, let alone participated in it. No communications by letter or otherwise were conducted ex parte. Whatever the merits of Rosenberg's argument that the Parole Commission erred in its consideration of the Brinks charges, an issue not properly before me, there is no evidence that the government's actions were vindictive; nor do they constitute a *de facto* prosecution.

A brief review of the statutory scheme governing parole determinations confirms this holding. 18 U.S.C. § 4206(a), which governs parole determination criteria, instructs the Commission to consider "the nature and circumstances of the offense and the history and characteristics of the prisoner." § 4207, which further defines the information considered, contains a catchall provision which states that "[t]here shall also be taken into consideration such additional relevant information concerning the prisoner ... as may be reasonably available." 28 C.F.R. § 2.19 also pertains to information considered by the Commission and further delineates the type and sources of information upon which the Commission may rely. § 2.19(b)(1) provides, in part, that "[t]he Commission encourages the submission of relevant information concerning an eligible prisoner by interested persons." § 2.19(d) specifically states that "[r]ecommendations and information from sentencing judges, defense attorneys, prosecutors, and other interested parties are welcomed by the Commission." § 2.19(c) provides,

among other things, that "[t]he Commission may take into account any substantial information available to it in establishing the prisoner's offense severity rating, salient factor score, and any aggravating or mitigating circumstances, provided the prisoner is apprised of the information and afforded an opportunity to respond." The federal regulation specifically allows the Commission to consider evidence of crimes for which the prospective parolee has been acquitted. § 2.19(c).

Courts have interpreted these provisions and expanded upon them. With respect to the scope of an inmate's conduct which the Commission may consider, the Second Circuit has held that:

> Concerning ... whether the Parole Board can consider the circumstances of the prisoner's offense behavior as described in his presentence report, this court has uniformly held that a sentencing judge has wide latitude in taking into consideration all matters bearing upon the personal history and behavior of the convicted accused, *and this is by no means confined to the defendant's conduct in connection with the offense for which he was convicted.* .... If, therefore, the sentencing judge is not limited to consideration of only that criminal conduct of the defendant which related to the offense for which he was

convicted, the Parole Board, which is concerned with all facets of a prisoner's character, make-up and behavior, is, a fortiori, certainly entitled to be fully advised of the contents of the presentence report *and to use it in giving an offense severity rating* and for such other purposes that it finds necessary and proper.[36]

*Billiteri v. United States Board of Parole,* 541 F.2d 938, 944 (2nd Cir.1976) (emphasis added); *see also, Arias v. United States Parole Commission,* 648 F.2d 196, 200 (3rd Cir.1981) ("Commission acted neither improperly nor unconstitutionally when it examined appellant's presentence report which included information relating to a separate, dismissed indictment.")

More to the point, in *United States ex rel. Carrasquillo v. Thomas,* 677 F.2d 225 (2nd Cir.1982), the Second Circuit held that "the sole issue before us on appeal is whether criminal charges contained in an indictment dismissed with prejudice can form the basis for a subsequent revocation of parole. We find that the double jeopardy clause of the fifth amendment does not bar use of the charges in a parole revocation proceeding." Although the case is not dispositive since it addressed parole revocation, rather than initial parole determination, and double jeopardy, as opposed to Rule 48, the reasoning is analogous.[37]

---

**36.** Admittedly, the primary source of the information in this case was the government's letter, even though the presentence report prepared in connection with Rosenberg's New Jersey conviction contained information about the Brinks allegations. However, I see no reason why the Parole Commission would be allowed to consider conduct unrelated to the offense of conviction if it is included in a presentence report, regardless of whether the Judge relied on that information when calculating the sentence, *see* discussion *supra,* but not if it is included in a separate post-sentence letter. The defendant has the opportunity to dispute the information in either case, and the issue is resolved by the same standard, a preponderance of the evidence.

**37.** This is especially so in light of the Supreme Court holding in *Greenholtz v. Inmates of Nebraska Penal and Correctional Complex,*

442 U.S. 1, 9, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979), distinguishing between parole revocation and parole release: "It is not sophistic to attach greater importance to a person's justifiable reliance in maintaining his conditional freedom so long as he abides by the conditions of his release, than to his mere anticipation or hope of freedom." *Id.* at 10, 99 S.Ct. 2100 (quoting *United States ex rel. Bey v. Connecticut Board of Parole,* 443 F.2d 1079, 1086 (2nd Cir.1971)). Since a parolee has a greater interest at stake than a prisoner, it would make little sense to allow the Parole Commission to consider dismissed charges in a revocation hearing, but not in an initial parole hearing. Because the dismissed charges may be considered in a revocation proceeding, even if a parolee and a prisoner were entitled to the same due process protections, the conclusion remains the same.

Carrasquillo argued that because the government could not reindict him for the dismissed charge, it was similarly precluded from prosecuting him at the parole revocation hearing. However, Judge Weinfeld held for this Court in an opinion upon which the Court of Appeals based its affirmance, that "[i]t is stating the obvious to say that a criminal prosecution and a parole ... proceeding differ in concept and purpose and that the proof necessary to sustain each is different." *United States ex rel. Carrasquillo v. Thomas*, 527 F.Supp. 1105, 1109 (S.D.N.Y.1981). Judge Weinfeld noted that neither principles of double jeopardy nor res judicata preclude the use of acquitted charges to deny or revoke parole. He reasoned that, there having been no trial on the merits and consequently no prior determination of guilt or innocence, there was no arguable basis for preventing the Parole Commission from considering the dismissed charges. *See also, Baxter v. Davis*, 450 F.2d 459, 460–461 (1st Cir.1971) ("a nolle prosequi does not establish the innocence of one charged with a crime. The parole board was therefore entitled to take into account the finding of probable cause and the return of the grand jury indictments charging petitioner with unarmed robbery and assault and battery in deciding whether to continue him on parole."); *Yearwood v. Nickels*, 1999 WL 359909 (D.Kan.1999) ("The dismissal of charges ... where state prosecutor decided not to prosecute given petitioner's return to federal custody, does not suffice to establish that a board decision to revoke parole based on the same conduct lacks evidence to support it.").

These cases dispose of Rosenberg's due process claim that, deprived of a trial record by the nolle, she could not adequately contest the Brinks charges against her. If the absence of a trial record alone put a defendant at such a disadvantage as to make it impossible to dispute unadjudicat-ed conduct, a dismissed charge could never be considered by the Parole Commission. However, that is clearly not the law in this circuit. If the government had, in effect, prosecuted Rosenberg in a manner akin to what transpired in *Maddox*, and, thereby, transformed the parole hearing, which as noted in *United States ex rel. Carrasquillo* is not normally the same as a prosecution, into a mock trial, then it would be proper to restrict, if not preclude, the use of the dismissed charges. For the reasons already explained, this was not the case here.

Other cases document the prevalent use of dismissed charges and unadjudicated offenses in making parole determinations. In *Iuteri v. Nardoza*, 732 F.2d 32 (2nd Cir.1984), for example, the Court of Appeals emphasized the discretion enjoyed by the Parole Commission, and specifically upheld the Commission's decision to go beyond the guidelines when determining a release date, *see* discussion *supra* Part I.F.-G., on the basis of allegations of crimes not related to the offense of conviction.[38] *See also, Billiteri*, 541 F.2d at 944 (Parole Commission may consider presentence report, including unadjudicated or dismissed charges contained therein); *Arias v. United States Parole Commission*, 1991 WL 73831 (S.D.N.Y.1991) (Parole Commission may consider dismissed counts of an indictment generally, as well as charges dismissed pursuant to plea agreement unless otherwise stated); *Gallina v. United States Parole Commission*, 1988 WL 13755 (S.D.N.Y.1988) (Commission may consider charges dismissed after prosecution led to two hung juries); *Casoria v. Warden, Federal Correctional Institution, Otisville, New York*, 1988 WL 70302 (S.D.N.Y.1988) (Commission may consider offenses alleged in presentence report and sentencing memorandum, even though never charged with those offenses);

---

**38.** Admittedly the Commission appeared to be concerned with Iuteri's potential dangerousness. In the present case, the record is clear that the Commission denied parole because release would depreciate the seriousness of the offense or promote disrespect for the law. *See* discussion *infra* Part III.D.

*Malizzia v. United States Parole Commission,* 1984 WL 831 (S.D.N.Y.1984) (Commission has discretion to consider dismissed counts of an indictment).

For the reasons stated above, the government's letter to the Parole Commission cannot be recast as a prosecution of the Brinks crimes. As demonstrated, the Parole Commission is afforded wide discretion and is empowered to consider any relevant information. As a matter of regular practice the government submits a Form 792 to the Commission. However, the Commission also encourages and sometimes requests the submission of additional information. For example, in *Smith v. Thompson,* 937 F.2d 217 (5th Cir.1991), the Parole Commission requested from the probation officer information concerning a dismissed murder charge, unrelated to the offense of conviction. The probation officer forwarded a sworn statement from a police officer who had been involved in the murder investigation. This material was then used as an aggravating factor to go above the guidelines in setting a release date.

Similarly, in *Iuteri,* 732 F.2d 32, the Commission accepted and relied upon information concerning allegations of unrelated offenses with which the prisoner had never been charged. Interestingly, the information concerning the allegations, which was unsolicited by the Commission, was provided by a federal Strike Force Attorney and state prosecutors, who were planning on trying Iuteri for an unrelated state murder charge. Specifically, the Strike Force Attorney wrote a letter to the Commission, and submitted with it the transcript of the sentencing hearing for Iuteri's federal conviction and a belated Form 792 completed by the AUSA who prosecuted the offense of conviction, detailing allegations of aggravated assault and of forcing a young woman into prostitution. On the basis of these allegations, the Commission reversed its earlier decision and denied parole.

Iuteri had already received a presumptive release date. Shortly before his release, and perhaps not by coincidence, after Iuteri demonstrated his ability to post bail on the separate unrelated state charge which was going to trial, the Strike Force Attorney and state prosecutors sought a reconsideration of the parole determination based on new information. The Commission was allowed to consider the information even though it was unsolicited, submitted by prosecutors other than the AUSA who prosecuted the offense of conviction, and there appeared to be no explanation why the information had not been provided earlier.

After speaking critically of the prosecutors's "eleventh hour campaign to keep Iuteri incarcerated," District Judge Eginton stated that "[t]hese unfortunate circumstances should not, however, sway the court in its review of the Commission's actions unless it appears that the Commission tacitly and improperly permitted the vociferousness of these authorities' desires to influence its calculation of a period of incarceration. Here the court looks not to the propriety of the submissions, but rather to whether the Commission acted arbitrarily and capriciously in translating the information considered into a period of incarceration." *Iuteri v. Nardoza,* 560 F.Supp. 745, 754 (D.Conn.1983).

In other words, in *Iuteri,* the court was of the opinion that the public interest in having the Parole Commission consider all relevant material when making its determination outweighed the potential harm resulting from the delay caused by the belated submission and the government's seemingly questionable efforts to circumvent the prisoners entitlement to release on bail. The primary concern was to ensure that the Parole Commission considered the information in the proper manner, no matter the source and timing of the submission. I need not go that far. In the present case, the government timely submitted its letter in response to the Commission's request. Even if the gov-

ernment was overzealous in its unsolicited and vehement recommendation against parole, it is the Commission which is charged with properly valuing the recommendations and information presented to it. To the extent that Rosenberg seeks to contest the manner in which the Commission considered the government's letter, she must make those arguments to a different court on another day. *See* discussion *supra* Part II.B.

While this Court is not unaware of the seeming hypocrisy of a criminal system founded on the notion that a person is innocent until proven guilty, but which also allows a person to be held accountable for allegations which have not been adjudicated, there is little doubt such is the system Congress has created. "There is a crucial distinction between being deprived of a liberty one has, as in parole, and being denied a conditional liberty that one desires....That the [government] holds out the possibility of parole provides no more than a mere hope that the benefit will be obtained." *Greenholtz v. Inmates of Nebraska Penal and Correctional Complex,* 442 U.S. 1, 9–11, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979).

## D. *Unrelated Offenses v. The Offense of Conviction*

The record on this motion shows that (1) the government explicitly argued in its November 8, 1994 letter to the Parole Commission that paroling Rosenberg on the New Jersey crimes would depreciate the seriousness of the Brinks crimes, and (2) the Commission accepted that argument in denying Rosenberg parole on the New Jersey crimes. These circumstances squarely present the question of whether the Commission misinterpreted 18 U.S.C. § 4206(a)(1). The parties devote a considerable portion of their briefs to that question.

§ 4206(a) provides that a prisoner "shall be released" if the Commission, "upon consideration of the nature and circumstances of the offense and the history and charac-

teristics of the prisoner, determines (1) that release would not depreciate the seriousness of his offense or promote disrespect for the law; and (2) that release would not jeopardize the public welfare ..." § 4206(a).

Rosenberg contends that when the Parole Commission is considering whether release would "depreciate the seriousness of [a prisoner's] offense" under § 4206(a)(1), its consideration is limited to the offense of conviction. Unrelated offenses, Rosenberg argues, are relevant only in determining whether a prisoner's release would "jeopardize the public welfare" as provided in § 4206(a)(2), a determination which, as Rosenberg correctly observes, the Commission resolved in her favor. On that construction of § 4206(a)(1), Rosenberg's argument concludes, the Commission violated the statute by denying her parole on the New Jersey offenses on the basis of the seriousness of the Brinks offenses, as depicted by the government.

The government responds that § 4206(a)(1) does not define "offense" so as to exclude offenses unrelated to that of conviction, and that in any event, given the subsection's use of the disjunctive word "or," the Commission may consider the Brinks offenses in determining whether Rosenberg's early release would "promote disrespect for the law."

As previously explained in text, the issue of whether the Parole Commission proceeded properly and in obedience to the governing statute is not before this Court on this application. Accordingly I express no view with respect to this question of statutory construction. It suffices for present purposes to say that the question appears to be one of substance. Accordingly the government's request that the Commission consider the Brinks offenses cannot be equated with malice or bad faith.

## IV. CONCLUSION

For the foregoing reasons, I conclude that the applicable statutes, regulations,

and appellate court decisions interpreting them preclude this Court from granting any relief to the applicant, Susan Rosenberg.

Notwithstanding that conclusion, I think that this is a troublesome case, for several reasons. In assessing those reasons, I attempt to view the case through the eyes of that icon of the common law, the reasonable man, who lacks the advantage (or disadvantage, depending upon one's point of view) of a formal legal education.

First, the reasonable man might be troubled by the timing of the government's conduct and the practical consequences of that conduct. The government indicted Rosenberg in this District on the Brinks charges. Her conviction would have added significantly to the length of Rosenberg's imprisonment on the New Jersey conviction. A conviction would also have required the Government to prove Rosenberg's complicity in the Family's crimes beyond a reasonable doubt, a burden the government failed to sustain with respect to the two acquitted defendants in the first trial before Judge Duffy and a jury. The government decided not to try to satisfy a jury of Rosenberg's guilt in the Brinks case. Instead, the government nolled the Brinks charges against Rosenberg, professing satisfaction with Judge Lacey's 58-year sentence in New Jersey, although the government had to know that Rosenberg had a statutory right to consideration for parole after ten years. When Rosenberg came to be considered for parole, the government, no longer satisfied with the full parameters of Judge Lacey's sentence, used the untried and unproven Brinks charges as the basis for an unsolicited recommendation to the Parole Commission that Rosenberg be denied parole. The Commission accepted that recommendation and postponed Rosenberg's parole for another 15 years, although her New Jersey co-defendant, receiving the same sentence from Judge Lacey and regarded by the Commission as a greater potential risk to society, had already been paroled.

The reasonable man might regard the government's conduct as unfair.

Second, the reasonable man might regard the content and tenor of the government's November 8, 1994 letter to the Parole Commission as unfair in the circumstances. As to content, in recommending against Rosenberg's parole, the government answered a question which the Parole commission did not ask. The government would have responded fully to the Commission's purely factual inquiries by explaining the nolle and outlining the government's evidence against Rosenberg, as in fact the government did in the first pages of its letter. The recommendation against parole was accordingly gratuitous. As to tone, the government's recommendation was cast in the impassioned language of a jury summation. Its author undoubtedly regarded that language as objective and justified. The reasonable man might regard the government's phrasing as subjective and vindictive.

Third, the reasonable man might be moved in Rosenberg's favor by the positive manner in which she has changed her life during incarceration. While the government dismisses that factor with a sneer— "even if Susan Rosenberg now professes a change of heart about her pursuit of violence as a means to achieve her political objectives," November 8, 1994 letter at 7— the evaluations of professionals in the field are powerful.

Dr. Gibson, the Chief Psychologist at FCI, Danbury, says that "in his 14 years in prison work he has never regarded a prisoner as highly as he does" Rosenberg. (Tab 9 at 4). As an example of her "numerous services to the institution and the Bureau of Prisons as a whole," Gibson says that "when he spots a female prisoner who is new and having difficulties" he would often recruit Rosenberg to help that individual, "asking her to make contact with the new prisoner and work with her helping her to adjust to the prison life."

Rosenberg "has been extremely effective in this area." *Id.*

Prison Chaplain Raftery, who has supervised Rosenberg's work as Chapel clerk and librarian since May 1995, describes Rosenberg's innovative work in the Chapel Pastoral Care Department's prison AIDS ministry, including developing and writing, "under the auspices of the Psychology Department, an Inmate Handbook for HIV+ women inmates that the Chaplains are using in their counseling efforts in several BOP institutions." (Tab 11 at 1). Chaplain Raftery says that on the basis of her personal contacts with Rosenberg, she sees her "public rejection of terrorism and violence as a method for social change to be thoroughly sincere. In fact, I am a witness to this rejection and conversion which has allowed her to develop in prison as a peace-loving and caring woman who knows how to make decent and positive choices in relation to herself and towards others." *Id.* at 2.

Unless one is prepared to dismiss the opinions of the prison Chief Psychologist and Chaplain as dupes (and I am not), then it would seem that Rosenberg has undergone not so much a rehabilitation, which some would say is an objective of the prison system, as a redemption, which some would say is an objective, perhaps the principal objective, of God. And either concept is significant in the context of Judge Lacey's New Jersey sentence, since Judge Lacey cautioned against parole for Rosenberg and Blunk "after serving only 10 years *if their attitude then is as it is now.*" (emphasis added). That would not appear to be the case with Rosenberg, which again highlights the fact that she faces an additional 15 years in prison solely because of the Parole Commission's reaction to the government's letter to the Commission regarding the Brinks crimes.

In discussing the factors that make this case troublesome, I have been careful to say that the common law's reasonable man "might" be troubled by them. And indeed, my understanding is that the able and devoted counsel for Rosenberg on this application was retained by citizens who felt just that way. But the reasonable man, for whom lawyers presume to speak at their peril, might conclude that if the government has correctly identified Rosenberg as a participant in the Brinks crimes (as the government contended and the Parole Commission agreed), her denial of parole was wholly justified.

I will press the reasonable man analysis no further. The answer to Rosenberg's application for relief must be found in the law; and the law's answer seems plain enough to this Court. The law neither precludes nor condemns any aspect of the government's conduct in this case, including the November 8, 1994 letter. Whether the Parole Commission violated the governing statute in considering the Brinks crimes as the ground for denying Rosenberg parole on her New Jersey sentence is not a question which this Court is competent to decide. The conclusion I reach on the questions properly before me is that Rosenberg has not shown an entitlement to any relief from this Court.

Accordingly Rosenberg's application is denied in all respects.

It is SO ORDERED.